## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

_____

NOT DEAD YET MANUFACTURING,
INC., d/b/a NDY MFG. INC.,

              Plaintiffs,

      v.

PRIDE SOLUTIONS, LLC, and MAY WES
MANUFACTURING,

              Defendants.

Case No.: 13 CV 3418

Judge: Hon. Rebecca Pallmeyer

_____

### PRIDE'S RESPONSE MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION [DOC. # 135] TO EXCLUDE CERTAIN OPINIONS OF PRIDE'S TECHNICAL EXPERT, DR. FREDERICK T. ELDER

Defendants Pride Solutions, LLC, and May Wes Manufacturing (collectively, "Pride"), hereby

respond to Plaintiff's ("NDY") limited[1] motion to exclude certain opinions of Dr. Frederick T. Elder.[2]

(Doc. # 135.)

---

[1] As best as Pride can understand from NDY's motion, NDY does not seek to strike the majority of Dr. Elder's expert report. NDY, however, confuses the matter by making no prayer for relief specifying which particular phrases, sentences, paragraphs, or sections, if any, of Dr. Elder's report should be stricken. Although NDY's motion cites various portions or pages of Dr. Elder's report (sometimes shown as blocked sections on Exhibit 1 to NDY's memorandum), NDY does not request (nor does it seem plausible that it could request) that the entirety of those sections be stricken.

[2] Responsive to an expert report on infringement proffered by NDY on December 4, 2015, Dr. Elder submitted an expert report (which is the subject of NDY's motion) on January 6, 2016 (attached hereto as Ex. 1). The report concerned issues of non-infringement of the 8,418,432 patent ("'432 patent") and 8,745,963 patent ("'963 patent") asserted by NDY in this case. On March 21, 2014, the parties requested (and the Court, at a March 25, 2014 hearing agreed) that "fact and expert discovery related to damages, and the substantial costs typically involved therewith, should be stayed pending a determination of liability, i.e. patent infringement, patent validity, and willful infringement." (*See* Doc. # 32 (March 21, 2014 agreed motion), at p. 2; Doc. # 36 (March 25, 2014 minute order).) Accordingly, Dr. Elder did not develop opinions on issues such as the availability of commercially acceptable non-infringing alternatives, which relate only to possible damages if and only if the Court first finds liability for infringement.

Under Fed. R. Evid. 702, expert testimony is admissible if "specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case."

The Court should recognize that NDY in no way disputes that Dr. Elder is an expert on the relevant technology and that he has examined the accused products that are the subject of the parties' infringement and non-infringement analyses. Among his many qualifications, Dr. Elder has a Ph.D. and has over 40 years of experience in mechanical engineering, including university teaching, research, consulting, and experience with agricultural equipment. (*See, generally*, Ex. 1 hereto, at pp. 1-2 (Background and Qualifications) and Ex. A (Curriculum Vitae).) Indeed, NDY expressly recognizes that Dr. Elder is qualified and has "the relevant background or knowledge to serve as an expert on the relevant technology." (Doc. # 136, at p. 2.) Accordingly, there is no reasonable dispute that Dr. Elder "is qualified as an expert by knowledge, skill, experience, training, or education" under Fed. R. Evid. 702.

Given Dr. Elder's indisputable expertise and that his analyses are based on examining the technology at issue and his application of engineering principles, a common theme throughout NDY's motion is not to attack the reliability of Dr. Elder's opinions and observations of the accused products from an engineering or scientific standpoint. Instead, NDY generally quibbles about the weight such observations should be given if they are taken to be true. *Cf. ActiveVideo Networks., Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (holding that motion to exclude was properly denied where, "[a]t their core," the disagreements were "with the conclusions reached by [the] expert and the factual assumptions and considerations underlying those conclusions, not his methodology";

"These disagreements go to the weight to be afforded the testimony and not its admissibility."); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.").

NDY's objections are weak, but in any event, premature because they presuppose several points of law and fact that parties will dispute in motions for summary judgment. Nevertheless, Pride responds to NDY's objections as follows.

## ARGUMENT

### A. The Court Should Not Strike Dr. Elder's Opinions Concerning His Understanding of the Meaning of "Support Member."

The proper construction of a claim term begins with the plain and ordinary meaning of a term in light of the specification to a person of ordinary skill in the art ("POSITA"). *See Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Accordingly, Dr. Elder clearly states in his report that where a claim term has not already been construed by the Court, his "understanding of such terms [is] from the perspective of a person of ordinary skill in the art in view of the respective specification." (Ex. 1, at p.6, para. 20).

NDY does not in its motion develop substantive arguments opposing Dr. Elder's analysis of "support member," which Dr. Elder properly considers in light of the specification of the '963 patent. Rather, in a conclusory footnote, NDY requests a further "opportunity to demonstrate the legal fallacies of Dr. Elder's claim construction opinions." (Doc. # 136, at p. 4 n.1.) Instead of actually demonstrating the supposed fallacies, NDY argues that Dr. Elder's opinions concerning "support member" should be

stricken because neither NDY nor Pride asked the Court to construe the term during the claim construction phase. But NDY's waiver argument should be rejected for at least two reasons.

First, the local patent rules specifically set forth that parties are generally limited to presenting ten claim terms to the Court for claim construction under LPR 4.1(b) (after the parties exchange of claim terms under LPR 4.1(a)); but the comment to LPR 4.1 also fully recognizes that "the parties may dispute the construction of more than ten terms" without regard to whether they are presented to the Court for construction at that time. Nowhere do the rules suggest that all disputes as to terms that are not presented (because they are beyond the ten maximum, or any other reason) are thereby simply forgotten. NDY has long known that in both the pre-Markman and post-Markman contentions exchanged by the parties, the parties have disagreed (and continue to disagree) about whether any of the accused device includes a "support member" within the meaning of the '963 patent. As with any disputed infringement issue, NDY bears the burden of proving to the trier of fact that the "support member" term of the '963 patent is met by the accused devices. *See, e.g.*, *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 849 (2014).

Second, and more important, it is simply unfair and hypocritical for NDY to ask the Court to disregard Dr. Elder's opinions by some theory of waiver, considering that Dr. Elder's January 6, 2016 report was responsive to NDY's December 4, 2015 expert report, which first opined on the construction of "support member." (*See* Ex. 2, at pp. 7, 29.) The proposal of claim terms for construction under LPR 4.1(b) was the joint responsibility of all parties, therefore, the possibility of waiver for failure to propose a claim term would have to cut at least as much against NDY as against Pride. Dr. Elder's expert report on non-infringement was responsive to Mr. Johnson's first

post-Markman report. For that reason alone, there was nothing improper about Dr. Elder providing his own opinions concerning "support member."

## B. Dr. Elder Does Not Rely on Any Construction of "Plate Member" Different from the Court's Construction.

NDY's argument that Dr. Elder somehow rehashes claim construction arguments concerning "plate member" or bases his opinions on a definition of plate member contrary to the Court's construction is simply wrong. Dr. Elder's report unequivocally recognizes that the relevant construction of "plate member" on which he relies is "a single smooth thin flat sheet of material that may contain minor angles or curves" (Ex. 1, at p.5, para. 19.a.), i.e. the Court's construction (Doc. # 112 (October 5, 2015 Claim Construction Order), at p.13). Dr. Elder uses that construction throughout his report to opine that no accused device has the claimed "plate member." (*See, e.g.*, Ex. 1, at pp. 7-9, 12, 19, 36, 38, 63.)

Despite NDY's insinuations to the contrary, never does Dr. Elder contend that a component fails to meet the Court's construction of plate member merely because it contains a bend.[3] Indeed, he even recognizes that item 26 shown in Fig. 6 of the '432 patent has a minor bend, but nevertheless understands that it falls within the Court's construction of "plate member." (*See* Ex. 1, at p. 23-24.) Dr. Elder's report simply notes that in the understanding of a POSITA, bending of a material that was originally understood to be a plate can render that material no longer a plate. (*See* Ex. 1, at p. 17.) His understanding is supported by commonly accepted standards such as the ASTM[4], which acknowledge

---

[3] Of course, it should go without saying that a bend or bends that go beyond the "minor angles or curves" permitted by the Court's construction would render the "plate member" limitation unmet.

[4] NDY overemphasizes a minor issue of an innocent misquotation by Dr. Elder of ASTM A370-14 para 4.1. The provision is only one of several ASTM provisions Dr. Elder cites and quotes in his report. Dr. Elder openly corrected his mistake at his deposition when he recognized it. (*See* Doc. # 136-3

that bending may affect the properties of a material under test, and therefore distinguish how pre-bent and post-bent materials should be specified. (*See* Doc. # 136-7, at para. 4.1.) Dr. Elder's simple point — that bending affects the proper specification of a material — is fully consistent with and supports the Court's construction, which recognizes that bending of material that goes beyond "minor angles or curves" renders that material not a "plate member." In any event, Dr. Elder never relies in his analyses on any construction of "plate member" different from the Court's.

### C. Dr. Elder Does Not Rely on Any Construction of "Retention Means" or "Retention Member" Different from the Court's Construction.

The Court construed both the terms "retention means" and "retention member" as means-plus-function terms, each meaning: "a block or stop that retains the position of the stalk stomper with respect to the mounting bracket by restricting the longitudinal movement via engagement with a pin, and equivalents thereof." (Doc. # 112, at p.23.) Dr. Elder expressly states that he relies on the Court's construction of "retention means" and "retention member," and nothing suggests that Dr. Elder uses a different construction. (*See, e.g.*, Ex. 1, at pp. 5, 13-14, 32-33, 43, 45-46, 53-55.)

Where a patent claim uses a means-plus-function term, its coverage is limited to structures actually disclosed in the specification and equivalents thereof. *See* 35 U.S.C. 112(6); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351-52 (Fed. Cir. 2015). Here, the Court held that the claimed retention means or retention member in the form of a "stop" or "block" need not necessarily be the L-shaped bracket specifically shown in the specification of the '432 patent, but the Court did not hold

---

(Elder Deposition Transcript), at 170:24-172:6.) The mistake had no bearing on the substance of his opinions.

      ASTM A370-14, properly quoted, states: "Certain methods of fabrication, such as bending...may affect the properties of the material under test. Therefore, the product specifications cover the stage of manufacture at which the mechanical testing is to be performed." (*See* Doc. # 136-7, at para. 4.1.) This is consistent with the substance of Dr. Elder's opinions.

(as NDY seems to imply) that structural form or shape (or lack thereof) was entirely irrelevant to whether a component constitutes the claimed "stop" or "block." (*See* Doc. # 112, at p. 19.)

The Court further recognized that with respect to the '432 patent, the required structure of the retention means must be "on the plate member," meaning that it is "physically in contact with and supported by the surface of the plate member." (*Id.* at p. 20.). For a block or stop to be "in contact with" and "supported by the plate member" implicitly means that the claimed "block" or "stop" is separate from the claimed plate member and cannot be the claimed plate member itself. (Indeed, the Court analogously recognized that in construing "plate member having a crossbar," the crossbar and plate member must be separate components. (*See id.* at p. 14).)  As for the allegation that mere holes drilled into a claimed plate member could constitute the claimed "block" or "stop," Dr. Elder set forth his opinion that a POSITA would not consider a hole to be the claimed "block" or a "stop," because terms "block" or "stop," unlike a hole, imply the presence of something rather than an absence of something. (*See, e.g.*, Ex. 1, at p. 13-15, 33, 45-46; Doc. # 136-3 (Elder Deposition Transcript), at 108:25-109:11; *see also* Doc. # 69-3, at p. 185 (Joint Appendix C, NDY IPR Response, at p. 15) ("'hole' properly defined as an enclosed opening in a spaced-apart arm of a bracket through which a pin may be guided.").) Even if, as NDY insists, something is a "hole" by virtue of some material surrounding it, and even if it could ever be said that material constitutes a "block" or "stop," under the Court's construction of "retention means on the plate member," that said material at least cannot be part of the claimed plate member itself.

In his report, Dr. Elder observes that the essential longitudinal retaining function of the QD1 device is performed by a pair of holes in the sidewalls of the C-Channel (which NDY at times claims to be the alleged "plate member") through which a pin is inserted, which pair of holes, in his opinion, a

person of ordinary skill in the art would not understand to be a claimed "stop" or "block." (*See, e.g.*, Ex. 1. at pp. 13-15, 33, 45-46.) He further observes that a tube between the holes in the C-Channel sidewalls acts as a bearing surface to guide the pin between the holes. (*See* Ex. 1, at pp. 14-15, 46-47.) In any event, he observes (and NDY here does not argue otherwise) that neither the pair of holes nor the pin bearing meets the "on the plate member" limitation because neither is in contact with or supported by the surface of any plate member. (*See, e.g.*, Ex. 1, at 14-15.) All of Dr. Elder's observations are within the purview of his expertise, and while NDY is free to rebut them with its own arguments and evidence, there is no reason to preclude Dr. Elder's observations for consideration by the Court.

### D. The Court Should Reject NDY's Attempts to Strike Dr. Elder's Reasoned Opinions That, Other Things Being Equal, the Shape of the C-Channel of the Accused Devices Gives It Significantly Stronger Structural Integrity Than a "Plate Member."

With respect to the accused QD1, NDY relies on the doctrine of equivalents at least as an alternative theory of liability. (*See, e.g.*, Ex. 2 at p. 9.) With respect to the QD2, all of NDY's infringement contentions rely on the doctrine of equivalents. (*See, e.g.*, Ex. 2 at pp. 20, 31.)

Where a plaintiff relies on the doctrine of equivalents to show infringement, it must prove that each and every claim limitation that is not literally met nevertheless has a correspondence with some component of the accused device, such that any literal differences are "so insubstantial that the … invocation of the doctrine of equivalents [is] justified." *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 610 (1950). "The determination of equivalence should be applied as an objective inquiry on an element-by-element basis." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997). Part of that inquiry often will include the tripartite function-way-result test, whereby the plaintiff must prove that the component accused of infringing by

8

equivalence at least performs substantially the same functions, in substantially the same way, and with substantially the same result. *See id.*

NDY argues (at least contingently) that the C-Channel of the QD1 and QD2 meet the plate member limitation by doctrine of equivalents, meaning that even NDY recognizes that ultimately, the Court may hold that the C-Channel does not literally meet the limitation of "plate member" as defined as a single, smooth, thin flat sheet of material that may contain minor angles or curves. Notably, the C-Channel has three substantial sides (with adjacent sides at 90-degree angles), which Dr. Elder opines (and NDY does not here argue against), is not literally a plate member at least because its 90-degree angles are not "minor." (*See, e.g.*, Ex. 1 at p. 23.)

Assuming the C-Channel is not literally a "plate member," the question then arises whether NDY can nevertheless prove that the C-Channel is a covered equivalent under the doctrine of equivalents. Dr. Elder opines that other things being equal, the shape of the C-Channel (which has three substantial sides, with adjacent sides at 90-degree angles) makes it many times stronger from the standpoint of structural integrity and stiffness than a substantially flat material with at most minor angles or curves. (*See, e.g.*, Ex. 1 at p. 8, 10, 30-31.) NDY in no way disputes that it is within Dr. Elder's expertise to opine how the shape of a material affects its structural integrity. By way of illustration, Dr. Elder calculates that other things being equal, the shape of the C-Channel adds as much as 15.2 times as much structural integrity to the component compared with a material that is "a smooth thin flat sheet of material that may contain minor angles or curves." (*See* Ex. 1, at p.8-9.) NDY makes no reasonable argument that Dr. Elder's mathematical engineering analyses are incorrect—nor does NDY propose what different comparisons or assumptions, if any, would have been more appropriate for the illustration. Instead, NDY simply wants the Court to hold as a matter of law that structural integrity of

the C-Channel is entirely irrelevant to a doctrine-of-equivalents analysis with regard to the "plate member" limitation.

For at least three reasons, the Court should reject NDY's argument that differences in structural integrity are simply irrelevant to whether the C-Channel is equivalent to a "plate member." First, the only case NDY cites to suggest that structural integrity is never relevant to doctrine of equivalents is *Insta-Foam Prods. v. Universal Foam Sys.*, 906 F.2d 698 (Fed. Cir. 1990), says nothing of the sort. Second, the significant differences in structural integrity resulting from the shape of the C-Channel support why a person of ordinary skill in the art would not recognize it to be equivalent to a "plate member" (i.e., a single, smooth, thin flat sheet of material that may contain minor angles or curves). *See Warner-Jenkinson*, 520 U.S. at 37 (holding that "a skilled practitioner's knowledge of the interchangeability between claimed and accused elements is … relevant for … what it tells the fact-finder about the similarities or differences between those elements" and that "the perspective of a skilled practitioner provides content to, and limits on, the concept of equivalence"). Finally, even if the '432 patent does not expressly mention "structural integrity," it is self-evident (both in the claim language and specification) that the claimed plate member of the '432 patent must have structural integrity to perform the function of bearing the weight of other components of the stalk stomper assembly. As part of the function-way-result test, therefore, it is relevant to consider whether and how the shape of the C-Channel accomplishes structural integrity in a significantly different way and with a significantly different result.

Here Dr. Elder opines, in accordance with his expertise and analysis, that other things being equal, the shape of the C-Channel adds many multiples of structural integrity versus a substantially flat material having at most minor angles or curves. In all events, there is no reason at this stage to preclude

from the Court's consideration Dr. Elder's opinions on the effect of the C-Channel's shape in conferring structural integrity.

### E. The Court Should Reject NDY's Attempts to Strike Dr. Elder's Observations That No Pivoting or Pin Is Required In the Accused Devices to Connect the Stalk Stomper.

Pride recognizes that the Court held in its claim construction ruling that it will not treat pivoting (though recited in Claim 1 of the '432 patent) as a claim limitation. Nowhere in his report does Dr. Elder claim that the Court treated pivoting as a claim limitation,[5] and notably, nowhere does he contend that pivoting is an element necessary for NDY to show literal infringement.

Dr. Elder's pivoting analysis is only offered with respect to the doctrine of equivalents.[6] (*See, e.g.*, Ex. 1, at pp. 11-12, 16, 27, 29-32, 43, 50-51.) As already stated above, the function-way-result test under the doctrine of equivalents requires that each claim limitation that is not literally met have an identifiable correspondence in the accused device, performing substantially the same functions, in substantially the same way, and with substantially the same result. It is apparent not only in the language of Claim 1 of the '432 patent itself, but also in the specification, that an essential function of the claim limitations is to permit a quick connection of a stalk stomper to a toolbar assembly of a tractor or combine, and that the way such connection is to happen is by pivoting the stalk stomper into place and inserting a pin. Even in its *inter partes* review submissions, NDY cited to the USPTO a "rotational

---

[5] That Dr. Elder recognized (at his deposition) that "pivoting is...clearly part of the claim," simply states the obvious: pivoting is indeed expressly part of the claim language of Claim 1 of the '432 patent. (Doc. # 136-3, at 155:6-156:3.) Just because Dr. Elder recognized that pivoting is part of the claim language (which is unequivocally true), does not mean he mistakenly treated it as a claim *limitation* for purposes of his opinions on non-infringement.

[6] NDY generally makes no argument attempting to strike Dr. Elder's opinions that the accused devices do not literally have a "plate member," "plate member having a crossbar," "retention means on the plate member," or "plate member...above the pair of holes," as required by the Court's construction of the '432 patent.

mounting action" (i.e. pivot) to distinguish from the prior art the manner in which the claimed invention of the '432 patent connects the stalk stomper to the tool bar assembly. (*See* Doc. 84-5 (NDY IPR Expert Declaration), at p. 4, para. 15.) Indeed, this Court clearly held that pivoting is the necessary "result of other limitations already recited in the claim; in order for the cross bar to be received in the recesses and the pin inserted into the bracket holes … the stalk stomper must be pivoted." (Doc. # 112 (October 5, 2015 Claim Construction Order), at p. 29.)

Therefore, to prove infringement under the doctrine of equivalents, NDY must show at least that the allegedly equivalent components of the accused product operate with substantially the same function, in substantially the same way, and substantially the same result; that is, NDY must show that the accused equivalent device must be pivoted. Accordingly, even NDY's expert opined on pivoting (*see, e.g.*, Ex. 2, at p. 13) and Dr. Elder provided responsive opinions. Especially in light of all of the foregoing, the Court should deny NDY's request to hold pivoting entirely irrelevant to a doctrine-of-equivalents analysis.

Regarding the factual question of whether either the QD1 or QD2 requires pivoting, not even NDY's expert suggests that the QD2 requires or even permits pivoting. There are disputes, however, as to the nature of pivoting or lack thereof with respect to the QD1. Among other things, Dr. Elder observed that neither the QD1 nor QD2 requires pivoting for connection. (*See, e.g.*, Ex. 1, at pp. 11-12, 16, 27, 29-32, 43.) To the extent NDY wishes to offer countervailing evidence that the QD1 does require pivoting (e.g. earlier instructions published by Pride that have been determined by Pride to be inaccurate and have since been withdrawn), it is free to do so, but that is no reason to simply erase Dr. Elder's observations from consideration.

Relatedly, Dr. Elder recognizes that to connect the QD1 stalk stomper to the tool bar assembly, not only is no pivoting required, but also no pin is required, because unlike the claimed invention of the '432 patent, the QD1's C-Channel and different positioning of the cross bar causes a nesting action between the C-Channel and toolbar assembly such that no pin is required to provide vertical support. (*See, e.g.*, Ex. 1, at pp. 12, 16, 28-29, 31-32, 34.) All of these opinions are within the purview of Dr. Elder's observations and expertise, and NDY does not meaningfully suggest that they are inaccurate. NDY's only quibble is that the Court should only look to whether the accused devices require a pin when in use, and should completely disregard how the connection is made when not in use.

As the Court has recognized, Defendants have already argued that in light of the claim limitations and specification, a person of ordinary skill in the art would understand that in the claimed invention, the pin will act as a support when inserted in the bracket holes. (Doc. # 112 (October 5, 2015 Claim Construction Order), at 27.) NDY does not meaningfully dispute that argument here. In that light, Dr. Elder's observation that a pin is not required to act as a vertical support to connect the stalk stomper to the toolbar assembly in the accused devices is relevant to whether the accused components perform substantially the same functions, in substantially the same way, and with substantially the same result, and therefore is relevant to a doctrine-of-equivalents analysis.

In all events, there is no reason for the Court to strike Dr. Elder's observations and wholly eliminate them from consideration prior to motions for summary judgment.

**F. Dr. Elder Did Not Give an Improper Opinion on the Law in Simply Recognizing that NDY's Expert at Times Conflated More Than One Claim Limitation in His Doctrine of Equivalents Analysis.**

NDY argues, without citing any authority whatsoever, that Dr. Elder somehow rendered an opinion of law when recognizing that Mr. Johnson grouped several claim limitations together to support

his infringement contentions under the doctrine of equivalents. NDY's argument should be rejected outright for failure to cite any authority on the point whatsoever.

Of course, it is so that a doctrine-of-equivalents analysis requires a claim-term-by-claim-term analysis. *Warner-Jenkinson*, 520 U.S. at 40. Dr. Elder simply pointed out that as far as he could tell, Mr. Johnson failed to conduct the requisite term-by-term analysis. Aside from a conclusory denial, NDY makes no argument refuting Dr. Elder's understanding. In any event, Pride fully expects that the Court will make its own determination as to whether NDY's infringement contentions under the doctrine of equivalents improperly conflate claim terms, if the issue is presented for summary judgment.

### G. Dr. Elder's Analyses Do Not Improperly Depend on Comparisons to Preferred Embodiments.

NDY repetitively argues that because Dr. Elder uses diagrams from the patents-in-suit in his expert report, this somehow means his analyses are faulty because they are limited to comparisons with preferred embodiments. As already stated above, this is false. Dr. Elder and his report are clear that his analyses do not consist merely of comparisons with drawings from the patents (which are provided for illustration), but rather are governed by the Court's claim constructions.

**CONCLUSION**

For all the foregoing reasons, Pride requests that the Court (1) entirely deny Plaintiff's Motion (Doc. # 135) to Exclude Certain Opinions of Pride's Technical Expert, Dr. Frederick T. Elder, and (2) for such other and further relief as may be just and proper.

Dated: March 28, 2016

Respectfully submitted,

/s/ Tawfiq I. Ali

Dustin R. Dufault
DUFAULT LAW FIRM, P.C.
P.O. Box 1219
Minnetonka, MN 55345
Dustin@DuFault-Law.com
(952) 935-4392

Tawfiq I. Ali (6292261)
ALI LAW PRACTICE LLC
200 E. Randolph St. Ste. 5100-24
Chicago, IL 60601
tali@alilawpractice.com
(312) 970-1847

*Attorneys for Pride Solutions LLC
and May Wes Manufacturing*

## **CERTIFICATE OF SERVICE**

I, Tawfiq I. Ali, an attorney, certify that on March 28, 2016, I served the foregoing document through the Court's CM/ECF system to all counsel of record.

/s/ Tawfiq I. Ali

_____

Tawfiq I. Ali
ALI LAW PRACTICE LLC
200 E. Randolph St. Ste. 5100-24
Chicago, IL 60601
tali@alilawpractice.com
(312) 970-1847

# EXHIBIT LIST

<u>Exhibit 1</u>: Expert Report of Frederick T. Elder, dated January 6, 2016.

<u>Exhibit 2</u>: Expert Report of Larry Johnson, dated December 4, 2015.