**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NOT DEAD YET MANUFACTURING, INC., d/b/a NDY MFG, INC. ) ) ) | |
| Plaintiff, ) ) ) | Case No. 13 C 3418 |
| ) | Judge Rebecca R. Pallmeyer |
| v. ) ) ) | |
| PRIDE SOLUTIONS, LLC AND MAY WES MANUFACTURING, ) ) ) ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Not Dead Yet Manufacturing, Inc. ("NDY") brings this patent infringement suit against Defendants Pride Solutions, LLC ("Pride Solutions") and May West Manufacturing ("May West"). Plaintiff's president, Kenneth E. Shoup, is named as the inventor on a number of United States patents related to agricultural equipment. The two patents at issue in this case concern Shoup's invention of a "quick connect and disconnect" apparatus for the assembly of agricultural devices known as "stalk stompers." Stalk stompers are implements attached to the front of a combine or tractor that flatten cornstalks after they have been cut, thereby protecting the vehicle's tires from damage caused by the sharp stalks. Shoup's invention—the quick connect and disconnect apparatus—makes it easier to attach and remove stalk stompers from a tractor or combine by allowing users to secure the stalk stompers to a combine's toolbar assembly without the use of tools. Shoup was awarded a patent for the "quick connect/disconnect coupling for a stalk stomper" in 2013. U.S. Patent No. 8, 418, 432 (the "'432 Patent"). In 2013, he was awarded a related patent that includes additional claims directed to the overall quick connect/disconnect design concept. U.S. Patent No. 8,745,963 (the "'963 Patent"). Plaintiff alleges that certain of Defendants' stalk stomper products, which also contain quick connect and

1

disconnect features, infringe at least one claim of both the '432 Patent and the '963 Patent.

In October 2015, this court issued an opinion construing certain disputed terms in the patents' claims. *See Not Dead Yet Mfg., Inc. v. Pride Sols., LLC*, No. 13 C 3418, 2015 WL 5829761, at *1 (N.D. Ill. Oct. 5, 2015). Following the court's claim construction decision, technical experts on both sides submitted expert reports on the issue of infringement. Plaintiff's expert, Mr. Larry Johnson, is an engineer by training, and he currently works as the owner and principal consulting engineer of an engineering consulting company. He received a bachelor's degree in mechanical engineering and a master's degree in agricultural engineering, both from the University of Wisconsin-Madison, and he also holds a master's degree in business administration from the University of Detroit. Defendant's expert, Dr. Frederick Elder, is also an engineer by training. Dr. Elder is president of his own engineering consulting company. He holds a bachelor's degree in mechanical engineering from the University of Kansas, a master's degree in mechanical engineering from Wichita State University, and a Ph.D. in mechanical engineering from the University of Wisconsin-Madison.

Predictably, the experts reach different conclusions about whether Defendants' products, the so-called "QD1" and "QD2" stalk stompers, infringe Plaintiff's patents. Plaintiff's expert, Mr. Larry Johnson, opines that the QD1 product literally infringes claim 1 of the '432 Patent and claims 6 and 7 of the '963 Patent. As for the QD2 product, Mr. Johnson opines that it infringes those same patent claims under the doctrine of equivalents. Defendants' expert, Dr. Frederick Elder, responded to Mr. Johnson in a rebuttal report. In that report, Dr. Elder offers his opinion that the QD1 and QD2 products do not infringe claim 1 of the '432 Patent or claims 6 and 7 of the '963 Patent, either literally or under the doctrine of equivalents.[1] According to Dr. Elder, the QD1 product does not contain a "plate member" and thus does not contain the "retention means on the plate member" claimed in claim 1 of the '432 Patent. He contends, further, that the QD1

---

[1] The court assumes familiarity with its claim construction opinion in this case, which includes a description of the patented invention and diagrams of its preferred embodiments. *See Not Dead Yet*, 2015 WL 5829761, at *1–*2.

2

product does not contain a "retention member of the support member" claimed by the '963 Patent. Dr. Elder opines that the QD2 product also lacks these claimed elements, among others, and he asserts that several of the accused elements of the QD2 product perform different functions, in a different way, from the claimed elements and thus do not infringe under the doctrine of equivalents.

Plaintiff has moved to exclude [135] certain portions of Dr. Elder's opinions under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiff argues that although Dr. Elder may be technically qualified to offer his opinions in this case, certain of those opinions are unreliable and irrelevant. Specifically, Plaintiff insists that some of Dr. Elder's opinions are inconsistent with substantive patent law and with this court's claim construction rulings or are otherwise irrelevant to Plaintiff's infringement charges in this case. Defendants respond that Plaintiff's arguments regarding points of law are premature and should be addressed at the summary judgment stage. They also argue that Plaintiff's quibbles about the accuracy of Dr. Elder's opinions are contentions about the weight his opinions should be afforded, not about their admissibility. For the reasons discussed below, the court grants Plaintiff's motion in part and denies it in part.

## **DISCUSSION**

A qualified expert may testify only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles or methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702. Under *Daubert*, the district court plays the role of gatekeeper and must determine whether the expert's proposed testimony is relevant and reliable. *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015). "When analyzing the relevance of proposed testimony, the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case."

3

*Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). When it comes to determining the reliability of the expert's testimony, the district court must assess whether the reasoning or methodology underlying the expert's proposed testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Daubert*, 509 U.S. at 592–93. The focus of that inquiry "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. The soundness of the facts underpinning the expert's analysis and the correctness of the conclusions he reaches based on that analysis "are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith*, 215 F.3d at 718.

The court concludes that some of Dr. Elder's opinions would not help the trier of fact to understand the evidence or to determine a fact in issue; those opinions are irrelevant and must be excluded. Other opinions that Plaintiff challenges, however, are relevant to facts in issue in this case and are not so unreliable as to warrant exclusion. The court discusses Dr. Elder's inadmissible and admissible opinions in turn.

**I.      Inadmissible Testimony**

    **A.      Construction of the Term "Support Member"**

In his report, Dr. Elder opines that the term "support member," which is included in claim 6 of the '963 Patent, is synonymous with the term "plate member" or that it encapsulates "each of a plate member, cross bar member and a pair of sidewall members." (Rep. of Frederick T. Elder, Ex. 1 to Defs.' Resp. Mem. in Opp'n to Pl.'s Mot. to Excl. [137-1] (hereinafter "Elder Rep."), at 44 – 45, 47–48, 53, 56, 59, 63.) Plaintiff argues that Dr. Elder's attempt to define the term "support member" is a claim construction opinion. The court should prohibit him from presenting that opinion to the trier of fact, Plaintiff asserts, because "the construction of a patent, including terms of art within its claim, is exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *see also CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) (finding district court erred by

4

admitting expert testimony regarding claim construction). In any event, Plaintiff contends, Dr. Elder's opinion about the meaning of "support member" should be excluded because Defendants waived any argument about the construction of that term by failing to raise the issue at the claim construction stage. In response to this waiver argument, Defendants note that the local patent rules limit the number of patent terms the parties may present to the court for construction, but the rules do not suggest that disputes concerning terms not presented for construction are thereby waived. In addition, they argue that it would be unfair to exclude Dr. Elder's opinion regarding the meaning of "support member" when Plaintiff's expert, Mr. Johnson, applies his own understanding of the term's meaning in his expert report.

Although Defendants thus respond to Plaintiff's waiver argument, they have not addressed Plaintiff's contention that Dr. Elder's opinion should be barred because it is an improper attempt at claim construction. Dr. Elder's proposed definition for "support member" is not based on his technical expertise, but rather, on an interpretation of the language used in claim 6 of the '963 Patent in light of the language used in the patent's specification. (*See, e.g.*, Elder Rep. at 44–45.) Dr. Elder thus appears to be offering "a classic claim construction determination." *The Medicines Co. v. Mylan Inc.*, No. 11-CV-1285, 2014 WL 1979261, at *6 (N.D. Ill. May 15, 2014); *see id.* (excluding expert's claim construction opinion where expert's quotation of patent specification as basis for opinion "further evidence[d] that his opinion concern[ed] claim construction issues"). The court concludes that because Dr. Elder's opinion concerning the meaning of "support member" is an improper attempt at claim construction, it must be excluded. This does not necessarily mean, however, that Defendants are barred from making an argument about the meaning of the term. Should either side believe that additional claim construction is necessary, a party move for leave to present additional claim terms for construction. Whether it would be proper for the court to consider additional terms for construction, or whether claim construction arguments not raised earlier have been waived, are matters that can be addressed in the context of such a motion.

5

## B. Testimony Regarding the Structural Integrity of Elements of Defendants' Products

The preferred embodiment of Patent '432, identified as Figure 6 in the patent, *see Not Dead Yet*, 2015 WL 5829761, at *2, depicts a thin, flat, rectangular plate (labeled "item 26"), attached to the stalk stomper, that connects to a mounting bracket on the tractor or combine's toolbar during assembly of the product. *See id.* The depiction of a thin plate is an embodiment of the "plate member" limitation from claim 1 of the '432 Patent. *See id.*; ('432 Patent, Ex. A to J.A. [69-1], col. 4, ll. 65–66 ("stalk stomper being provided with a plate member").)



In his report, Dr. Elder contends that the elements of Defendants' products that Plaintiff has identified as the products' "plate members" are designed in such a way that they have greater structural integrity than the claimed "plate member." (Elder Rep. at 8–10, 30–31.) Dr. Elder points out that the accused elements are "'C' channels," not single, flat plates. That is, instead of the "single smooth thin flat sheet of material" depicted in item 26 of Figure 6 of the '432 Patent, the comparable element of Defendants' products has side walls extended down from its top surface at approximately a 90-degree angle. (*Id.* at 7–8.)



According to Dr. Elder, this "C" shape provides the "C" channel element with substantially more structural integrity than the claimed "plate member." To demonstrate this point, Dr. Elder assumes that the plate member depicted in Figure 6 is 3 inches wide and one-quarter inch thick and also assumes "a field condition where the skid shoe [item 18 in Figure 6] encounters a rock and is forced up so high that the spring (item 28) is completely compressed and tubular projections (items 30 and 32) come into physical contact while the skid shoe is still being forced upward by the rock encountered while the machine is moving." (*Id.* at 8.) Based on these assumptions and the specifications of the QD1 product's "C" channel, Dr. Elder calculates the moment (bending) load that would be placed on the plate member and the "C" channel, respectively, and concludes that the "C" channel member is 15.2 times stronger in bending than the claimed plate member. (*Id.* at 9.) Because the "C" channel has greater structural integrity, Dr. Elder contends, it is not an equivalent of the claimed plate member. (*Id.* at 10.) In other words, Dr. Elder believes that Defendant's product is superior.

Plaintiff argues that Dr. Elder's opinion about the structural integrity of elements of Defendants' products is irrelevant and should be excluded. Structural integrity is not relevant, according to Plaintiff, because it is not a claimed element, and is not discussed, in either patent. In addition, Plaintiff contends that Dr. Elder's structural integrity analysis is improper because it is based on a comparison of Defendant's products with a preferred embodiment (that is, Figure 6 from '432 Patent) of the claimed plate member, and the law is clear that "[i]nfringement, literal

or by equivalence, is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercial embodiment of the patentee, but with the properly and previously construed claims in the suit." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985). Defendants respond that the structural integrity of the "C" channel member is relevant to the determination of whether that member is equivalent to the claimed plate member. They contend that the differences in structural integrity would lead a person of ordinary skill in the art to conclude that the "C" channel member and the plate member are not equivalents. In addition, they argue that it is self-evident that the claimed plate member must have structural integrity to bear the weight of other components of the stalk stomper assembly. Structural integrity is, thus, a relevant consideration under the doctrine of equivalents' "function-way-result" test, Defendants urge, in determining whether the "C" channel member performs that same weight-bearing function, in the same way, to achieve the same result. *See Intendis GMBH v. Glenmark Pharm. Inc., USA*, 822 F.3d 1355, 1360 (Fed. Cir. 2016) (describing function-way-result test). Regarding the propriety of Dr. Elder's use of a preferred embodiment as a comparison for Defendants' products, Defendants respond that Dr. Elder uses that embodiment only as an illustration and point out that Plaintiff failed to propose more appropriate comparisons or assumptions for Dr. Elder to use in his analysis.

The court agrees with Plaintiff that Dr. Elder's opinion concerning the structural integrity of the "C" channel member is irrelevant, even under a doctrine-of-equivalents analysis. As the Federal Circuit explains in a case cited by Plaintiff, "[i]t is the limitations and functions of the invention described in the claims, not the elements or functions of the accused device, which establish the reference point for the doctrine of equivalents analysis." *Insta-Foam Prod., Inc. v. Universal Foam Sys., Inc.*, 906 F.2d 698, 702 (Fed. Cir. 1990). A product may infringe a claimed device's patents even though "the accused device performs functions in addition to those performed by the claimed device." *Id.* The appropriate question, therefore, is whether Defendants' products "perform[] substantially the same functions in substantially the same way

8

to achieve substantially the same result as does" the patented invention. *Id.* The possibility that Defendants' products perform those functions with the additional feature of enhanced structural integrity is beside the point. Defendants are correct that it is "self-evident" that "the claimed plate member of the '432 Patent must have structural integrity." (Defs.' Resp. Mem. in Opp'n to Pl.'s Mot. to Excl. [137] (hereinafter Defs.' Resp.) at 10). Plaintiff concedes as much. (Pl.'s Reply [138] at 9.) This does not mean, however, that the level of structural integrity is a claim limitation, or that the purported increased integrity of Defendants' products renders them not equivalent. It is also self-evident that the plate member must be visible so that the user can attach it to the toolbar assembly. But the addition of flashing lights to the plate member, thereby increasing its visibility, would not save the accused product from infringement.

The irrelevance of Dr. Elder's structural integrity opinions to the infringement analysis is reason enough to exclude them. But they must also be excluded because they are based on a comparison of the accused products to a preferred embodiment of the patent. Dr. Elder's computation of the structural integrity of the plate member of the '432 Patent is not based on the court's construction of that term as "a single smooth thin flat sheet of material that may contain minor angles or curves." Instead, Dr. Elder's opinion rests on "looking at Fig. 6 of the '432 Patent" and noting that the skid shoe in the preferred embodiment is free to rotate about the pivot pin, as well as other assumptions that are not contained anywhere within the terms of the patent. The inappropriate reliance on a preferred embodiment is another reason that Dr. Elder's opinions concerning the structural integrity of Defendants' products must be excluded. *See SRI Int'l*, 775 F.2d at 1121.

### C. Testimony Regarding the Necessity of "Pivoting" or the Use of a Pin for Assembly of Defendants' Products

Plaintiff also seeks to exclude certain of Dr. Elder's opinions comparing the way in which Defendants' products are assembled to the patented invention's required assembly. Specifically, Plaintiff objects to Dr. Elder's contentions (1) that Defendants' products, unlike the patented

invention, do not require "pivoting" of the stalk stomper when connecting it to the bracket on the toolbar assembly and (2) that Defendant's products, unlike the patented invention, do not require a pin to act as a vertical support to connect the stalk stomper to the toolbar assembly. One basis for Plaintiff's objection is that these assertions are so at odds with the facts that they are unreliable. That is, Plaintiff denies that Defendants' products can be assembled without pivoting the stalk stomper or without the use of a pin. The court is not persuaded that the purported inaccuracy of Dr. Elder's opinions provides a reason for excluding them. The accuracy of Dr. Elder's conclusions and the soundness of their factual underpinnings are issues of fact to be resolved at a later stage. *See Smith*, 215 F.3d at 718. The court does have concerns, however, about the relevance of Dr. Elder's opinions regarding pivoting and the use of a pin for assembly.

With respect to Dr. Elder's opinion about the necessity of pivoting the stalk stomper during assembly, Plaintiff contends that such testimony is irrelevant because the pivoting of the stalk stomper is not a limitation in any of the patent claims at issue. As the court ruled in its claim construction decision, "the meaning of the term 'pivoted,' and whether the stalk stomper is pivoted at all, is not integral to the invention." *Not Dead Yet*, 2015 WL 5829761, at *16. In response, Defendants concede that the pivoting of the stalk stomper is not a claim limitation, but they argue that Dr. Elder's "pivoting analysis" is relevant under the doctrine of equivalents. Specifically, they contend that because Defendants' products do not require pivoting of the stalk stomper, those products are not equivalent to the claimed invention because they do not perform the function of quick connection in the same way. The problem with this argument, as Plaintiff points out, is that the "essential inquiry" under the doctrine of equivalents is whether "the accused product or process contain[s] elements identical or equivalent to each *claimed element* of the patented invention[.]" *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997) (emphasis added). Although the court noted that the pivoting of the stalk stomper might be an incidental requirement of other limitations in the patent claims, pivoting

itself is not a claimed element of the invention. *Not Dead Yet*, 2015 WL 5829761, at *16. As a result, whether or not Defendants' products require pivoting of the stalk stomper during assembly is not relevant, even under a doctrine-of-equivalents analysis. *See Warner-Jenkinson*, 520 U.S. at 40.

Regarding Dr. Elder's opinion that no pin is needed to assemble Defendants' products, Plaintiff contends that this proposed testimony is irrelevant because Dr. Elder admits that a pin is necessary to maintain the assembly of those products while they are in use. Defendants do not dispute that a pin is required while the products are in use. They insist, however, that Dr. Elder's opinion that Defendant's products do not require that a pin be used to *connect* the stalk stomper to the toolbar assembly is nevertheless relevant under the doctrine of equivalents to show that Defendant's products do not perform the same functions, in the same way, with the same result.

The court agrees with Plaintiff that Dr. Elder's opinion on this issue is not relevant under the doctrine of equivalents or otherwise. The court's claim construction opinion made clear that the pin functions to engage the claimed "retention means" in order to prevent longitudinal movement of the stalk stomper "in operation" and to prevent the plate member's cross bar from disengaging from the recesses "in use." *Not Dead Yet*, 2015 WL 5829761. Whether Defendants' products require a pin when not "in use" is irrelevant to the function of any claimed element of the patented invention and is thus irrelevant even under the doctrine of equivalents.

### D. Testimony Regarding the Impermissibility of Grouping Claim Limitations as Part of a Doctrine-of-Equivalents Analysis

At certain points in his expert report, Dr. Elder notes that Plaintiff's expert, Mr. Johnson, groups claim limitations together as part of Mr. Johnson's doctrine-of-equivalents argument. Dr. Elder observes that it is his understanding that this tactic is impermissible under the law. (*See* Elder Rep. at 36, 43, 59, 63.) Plaintiff urges that this testimony contains an improper opinion of law that should be excluded. In their response, Defendants curiously argue that they expect

11

that "the Court will make its own determination as to whether [Plaintiff's] infringement contentions under the doctrine of equivalents improperly conflate terms, if the issue is presented for summary judgment." (Defs.' Resp. at 14.) Defendants effectively concede, therefore, that Dr. Elder's opinion regarding improper grouping of claim limitations is not an opinion related to a fact in issue about which he has expertise, FED. R. EVID. 702, but an opinion of law. Thus the court excludes Dr. Elder's opinion on this limited issue. Defendants' counsel, of course, remains free to make the legal argument in the appropriate context.

### E. Certain Testimony Concerning Aspects of the QD1 Product

Plaintiff also urges the court to exclude as irrelevant certain of Dr. Elder's opinions concerning Defendants' QD1 product. Dr. Elder explains, for example, that while the patented invention limits the longitudinal movement of the stalk stomper relative to the toolbar assembly's bracket, the QD1's pin bushings provide support in all directions, not only longitudinally. (*See, e.g.*, Elder Rep. at 49.) Plaintiff argues that this opinion about an additional function performed by the QD1 is "legally irrelevant." *See Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1271 (Fed. Cir. 1999) ("That two structures may perform unrelated—and, more to the point, unclaimed—functions differently or not at all is simply not pertinent to the measure of . . . equivalents."). Defendants fail to respond to this point, and the court agrees with Plaintiff that this additional feature of the QD1 is irrelevant to the infringement analysis. Dr. Elder also discusses a rectangular plate that is welded to the accused plate member of the QD1, and he argues that this welded part shows that the accused plate member is not a "single piece" as required for plate members under the court's claim construction. (*See* Elder Rep. at 9–10, 39.) Plaintiff points out that it makes no contention that this welded rectangular plate is part of the accused plate member and notes that the welded plate performs a function different than the plate member. Thus, Plaintiff argues, Dr. Elder's discussion of this part is irrelevant to its infringement contentions. Defendants again fail to respond to this point, and the court again concludes that Dr. Elder's discussion of the welded rectangular plate must be excluded.

## II. Admissible Testimony

### A. Assertion that Bending a Material Could Render It No Longer a Plate

Plaintiff objects to the admission of Dr. Elder's opinion that the C-shaped component in Defendants' products is not a "plate" because it is bent (*see* Elder Rep. at 17–18); this opinion, Plaintiff argues, is an attempt to rehash Defendants' claim construction argument regarding the meaning of "plate" and is also based, in large part, upon a misquotation of American Society for Testing and Materials ("ASTM") standards. In his report, Dr. Elder quoted ASTM as purportedly stating that "[b]ecause bending may affect the properties of the material under test, a bent part can no longer be defined as a plate per commonly accepted standards." (Elder Rep. at 17.) In fact, as Defendants now concede, the section of the ASTM standards that Dr. Elder cites contains no such quotation. It instead states that bending "may affect the properties of the material under test." Defendants contend that this mistake is a minor issue. (Defs.' Resp. at 5–6.) They also argue that Dr. Elder's opinion adheres to the court's ruling that a "plate member" may contain "minor angles or curves"; the bending of the "C" channel goes beyond "minor angles." *Not Dead Yet*, 2015 WL 5829761, at *7. To the extent Dr. Elder's opinion about whether the C-shaped component constitutes a plate relies upon the quotation from ASTM that "a bent part can no longer be defined as a plate," that opinion is inadmissible because it is based on a non-existent quotation. Defendants contend, however, that Dr. Elder is simply opining that a material that once was a plate can be rendered no longer a plate if it is bent. Dr. Elder provides support for this opinion beyond his ASTM quotation: he observes, for example, that the "C" channel was fabricated from a single piece of steel, fabricated from pig iron, but one would not "refer to the final shape as a pig, nor do we refer to the final 'C' channel as a plate . . . ." (Elder Rep. at 18.) It is not clear that Plaintiff is attempting to argue that the C-shaped component is a plate, despite its bends, because it was once made of a single sheet that constituted a plate. But to the extent Plaintiff is advancing that contention, Dr. Elder is free to respond that the bending of the original plate could make the final product something other than

13

a plate.

### B. Certain Testimony Regarding Whether Defendants' Products Contain Retention Means or Retention Members

Plaintiff presents a number of challenges to Dr. Elder's testimony regarding whether the claimed "retention means" or "retention member" is part of Defendants' products. According to Plaintiff, Dr. Elder's testimony about the lack of retention means (the term used in the '432 Patent) or a retention member (the term used in the '963 Patent) in Defendant's products rests improperly on a contention that a retention means or retention member must be limited to a particular shape. In its claim construction decision, the court determined that "retention means" and "retention member" are synonymous terms, each of which means "a block or stop that retains the position of the stalk stomper with respect to the mounting bracket by restricting the longitudinal movement via engagement with a pin member, and equivalents thereof." *Not Dead Yet*, 2015 WL 5829761, at *12. In reaching that conclusion, the court also noted that "[n]o patent language confines the retention stop or block to a specific shape." *Id.* at *10. Dr. Elder opines that the QD1 product does not contain a retention means because that product uses holes contained in the sidewalls of the "C" channel, and not an actual "block or stop" to restrict the stalk stomper's movement. (*See, e.g.*, Elder Rep. at 14.) Similarly, he opines that the QD2 product does not contain a retention means because that product holds the stalk stomper in place vertically through the use of a vertical pin that engages a hole in the top portion of the toolbar assembly's bracket. (*See, e.g.*, *id.* at 32.) Plaintiff argues that these opinions are based upon the shape of the accused retention means in Defendant's products and that they, therefore, are irrelevant because they run afoul of the court's ruling that the patent language does not "confine[] the retention stop or block to a specific shape." *Not Dead Yet*, 2015 WL 5829761, at *12.

As Defendants point out, however, although the court ruled that the patent language provides no limitation on the specific shape of the retention stop or block, the court did not hold

14

that a component's form or shape is irrelevant to whether that component constitutes a "stop" or "block" at all. Plaintiff contends that Dr. Elder's opinion that a hole cannot be a "stop" or "block" at all because it is a "hollow place" and not a physical "stop" or "block" is scientifically absurd. (Pl.'s Mem. in Supp. of Mot. to Excl. (hereinafter "Pl.'s Mem.") [136] at 12–13.) The court is less certain. Defendants are correct that the court's claim construction leaves open the possibility that although the claimed retention stop or block is not confined to a particular shape, a person of ordinary skill in the art might understand that certain shapes would not be considered "stops" or "blocks." And whether Dr. Elder's opinion that a hole cannot be a "stop" or "block" is absurd is a point that Plaintiff's counsel can press on cross-examination. *See Daubert*, 509 U.S. at 596.[2]

Finally, Plaintiff objects to the admission of Dr. Elder's opinion, with respect to the QD2 product, that a retention member must be a separate component from the "support member." (*See, e.g.*, Elder Rep. at 62.) According to Plaintiff, this constitutes an improper attempt at claim construction, an attempt that is clearly mistaken because the claim on its face suggests that the retention member is part of—and thus not a separate component from—the support member. (Pl.'s Mem. at 8.) Defendants respond that the court's claim construction ruling provided that the retention means must be "on the plate member," meaning that it is "physically in contact with and supported by the surface of the plate member." *Not Dead Yet*, 2015 WL 5829761, at *11. Dr. Elder should be free, they argue, to opine that a component that is not separate from the plate member and thus not "in contact with and supported by the surface of the plate member" would not constitute a "retention means on the plate member" under the court's construction. The court agrees. Dr. Elder's opinion on this issue appears to be a good-faith attempt to apply the court's construction of the claim terms, not an attempt to offer his own construction. To the

---

[2] Plaintiff also argues that Dr. Elder is mistaken that the QD1 uses holes as a retention means, making irrelevant his opinion about whether a hole can constitutes a "stop" or "block." The court concludes that whether Dr. Elder's characterization of the QD1 is accurate or not is also a matter to be addressed by the presentation of contrary evidence and cross-examination.

extent Plaintiff disagrees with Dr. Elder, it will have the opportunity to rebut that opinion at summary judgment or at trial.

## **CONCLUSION**

For the reasons stated above, Plaintiff's motion [135] to exclude certain opinions of Dr. Elder is granted in part and denied in part.

ENTER:

Date: November 28, 2016

_____
REBECCA R. PALLMEYER
United States District Judge