**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NOT DEAD YET MANUFACTURING INC., d/b/a NDY MFG, INC.** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **No. 13 C 3418** |
| **PRIDE SOLUTIONS, LLC and MAY WES MANUFACTURING,** | ) ) ) | **Judge Rebecca R. Pallmeyer** |
| **Defendants.** | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Not Dead Yet Manufacturing, Inc. has sued Defendants Pride Solutions, LLC and May West Manufacturing, a division of Pride, for patent infringement. Plaintiff's president, Kenneth E. Shoup, is the named inventor on a number of United States patents related to agricultural equipment, including at least two patents concerning "quick connect and disconnect" apparatuses for the assembly of devices known as "stalk stompers." As the court has explained in prior rulings in this case, *see Not Dead Yet Mfg., Inc. v. Pride Sols., LLC*, 222 F. Supp. 3d 657 (N.D. Ill. 2016); *Not Dead Yet Mfg., Inc. v. Pride Sols., LLC*, No. 13 C 3418, 2015 WL 5829761, at *1 (N.D. Ill. Oct. 5, 2015), a stalk stomper attaches to the front of a combine or tractor and flattens cornstalks after they have been cut, thereby protecting the tires of the combine or tractor from damage caused by the sharp remains of the stalks. Prior to the development of the "quick connect" apparatus, connecting and disconnecting a standard stalk stomper to a combine or tractor took a substantial amount of time. The "quick connect and disconnect apparatus" makes it easier to attach and remove the stalk stompers by allowing users to secure the stalk stompers to a combine's toolbar assembly quickly, without the use of tools.

Two patents are at issue in this case: U.S. Patent No. 8,418,432 (the "'432 Patent") was issued to Shoup on April 16, 2013, and U.S. Patent No. 8,745,963 (the "'963 Patent") was

issued to Shoup on June 10, 2014. Both patents concern quick-connect-and-disconnect apparatuses for stalk stompers, and Plaintiff owns both patents by way of assignment. Plaintiff and Defendants are competitors; both manufacture and sell stalk stomper products containing quick-connect-and-disconnect features. Plaintiff alleges that two of Defendants' products, the so-called "QD1" and "QD2" products, infringe at least one claim of both the '432 Patent and the '963 Patent. In addition, Plaintiff alleges that Defendants have misleadingly marketed the QD1 as "The Original Quick Disconnect Stalk Stomper," in violation of the federal Lanham Act and Illinois consumer protection statutes. Defendants deny that their products infringe the '432 Patent or the '963 Patent, either literally or under the doctrine of equivalents. They also deny that their advertisements were misleading or deceptive. In addition to contending that their products do not infringe the patents at issue, Defendants assert that (1) claim 1 of the '432 Patent and claims 6 and 7 of the '963 Patent are invalid for indefiniteness, (2) claims 6 and 7 of the '963 patent are invalid for anticipation, and (3) the '963 Patent is invalid because Plaintiff or its counsel failed to fulfill their duty of candor and good faith toward the U.S. Patent & Trademark Office ("USPTO").

The parties have filed cross-motions for summary judgment [150] [154]. Plaintiff moves for partial summary judgment, urging the court to rule that Defendants' QD1 product infringes claims 6 and 7 of the '963 Patent and claim 1 of the '432 Patent and that there is insufficient evidence for a finding that either patent is invalid for indefiniteness, anticipation, or inequitable conduct. Defendants respond that the evidentiary record supports their invalidity contentions. They maintain, further, that the QD1 does not infringe either patent because it lacks a number of claimed elements. Indeed, Defendants contend that no reasonable jury could find that either the QD1 or the QD2 infringes the patents at issue. In addition, Defendants contend that the record conclusively establishes that Plaintiff or its counsel engaged in inequitable conduct in the prosecution of the '963 patent, and they have moved for summary judgment of invalidity on that basis. Finally, Defendants argue that Plaintiff's false advertising and deceptive practices claims

must fail because, among other things, Plaintiff has failed to demonstrate that the alleged advertisements were actually false or deceptive.

For the reasons discussed below, the court grants both motions in part and denies them in part.

## BACKGROUND

Both parties have filed statements of material facts, and corresponding statements in opposition, as required by Local Rule 56.1. (*See* Pl.'s Stmt. of Mat. Facts in Supp. of its Mot. for Partial Summ. J. [152] (hereinafter "Pl.'s 56.1"); Stmt. of Mat. Facts Supp. Defs.' Mot. for Summ. J. [156] (hereinafter "Defs.' 56.1"). The following facts are largely taken from those statements.

### I.    The Patents at Issue

The court has already described the inventions covered by the '432 Patent and the '963 Patent in its claim construction ruling, *see Not Dead Yet Mfg.*, 2015 WL 5829761, at *1–*2, and will therefore provide only a brief description here. The following is a depiction of the preferred embodiment of the invention covered by the '432 Patent:



('432 Patent, Ex. A to Pl.'s 56.1 [152-2], FIG. 6.)  Stalk stompers protect the tires of a combine

or tractor by flattening cornstalks after they have been cut. Shoup's invention, as depicted above, allows users to attach the stalk stomper (10) to the combine's toolbar assembly (12) without the use of tools. Specifically, the invention allows a user, by means of nothing more than his or her hands and a small pin, to attach a bracket (42) on the toolbar assembly to a "plate member" (26), that is itself attached the stalk stomper's "shoe" (18) (the part that flattens the stalks). The Patent describes how a user would connect the bracket to the stalk stomper's plate member:

> [T]o connect the stalk stomper (10) to the tool bar assembly (12), the cross bar (29) is engaged in the recesses (46) and the stalk stomper (10) is pivoted so that the angle plate member (26) of the stalk stomper (10) is above the top of the pair of holes (48) and the pin (31) can be inserted into the transversely aligned holes (48) to connect the stalk stomper [] to the tool bar assembly. The pin (31) will engage the retention stop (27) to preclude longitudinal movement of the stalk stomper . . . to prevent the cross bar or transverse bar (29) from disengaging from the recesses (46) in use.

(*Id.* at col. 4, ll. 15–25.) To disconnect the stalk stomper, a user would simply remove the pin from the transversely aligned holes and remove the cross bar from the recesses. (*Id.* at col. 4, ll. 25–27.)

The '963 Patent covers a similar invention, though there are observable differences in the preferred embodiments depicted in the patent. Two of the preferred embodiments of the '963 Patent are displayed in the figures below.



4



('963 Patent, Ex. B to Pl.'s 56.1 [152-3], FIG. 8, FIG. 10.)  To assemble the device depicted in Figure 8 above as a preferred embodiment of the '963 Patent, "the cross bar (129) is engaged in the recesses (146) and the plate member (126) of the stalk stomper (110) is pivoted to align holes (148) with the one of the pairs of holes (150, 152 or 154) in the sidewall (125)." (*Id.* at col. 6, l. 64–col. 7, l. 1.)  In the device depicted in Figure 10, another preferred embodiment of the '963 Patent, the tool bar assembly (212) includes a tool bar (240) and a mount, and the implement assembly, "such as stalk stomper (210), includes an upper support member (215) which may include a plate member (226), a cross bar member (229) and a pair of sidewall members (225)." (*Id.* at col. 7, ll. 10–12, 22–25.)

## II.     The Accused Products

### A.     Design

Defendants have sold the stalk stomper product referred to in this litigation as the QD1 since June 2011.  Defendants' product also features a quick-connect-and-disconnect apparatus. That apparatus consists of a top or "header" bracket (labeled (1) in the figures below) that connects to what Defendants refer to as a "shoe bracket" (labeled (2.1) in the figures below).

(Pl.'s 56.1 ¶ 9.)



(*Id.*) The figure below depicts the top bracket and the shoe bracket when connected.



(*Id.*)  As displayed in the above figures, the QD1's shoe bracket contains what Defendants call a "C-channel member," composed of a flat upper surface and two descending sidewalls that support a cross bar adapted to fit into the recesses of the header bracket.  (*Id.* ¶ 14.)  Each

sidewall also contains a hole with a pin bushing,[1] and during operation of the stalk stomper, a pin must be inserted within the holes to engage with the pin bushing and restrict longitudinal movement of the shoe bracket relative to the header bracket.  (*Id.* ¶ 18.)

Defendants' second quick-connect-and-disconnect product is the QD2, developed approximately three years after the QD1.  As illustrated in the representative embodiment taken from Defendants' own patent application from 2015 and depicted below, the QD2 is similar to the QD1.  (Defs.' 56.1 ¶ 6.)



FIG.6

(*Id.*)  The header bracket of the QD2 has two sets of recesses, one near the front of the assembly and another further back.  Projections (210) from the shoe assembly fit with those recesses.  A securing pin, the end of which is labeled (230) in the figure above, engages the ledge of the header bracket to lock the shoe assembly in place.  (*Id.*)

### B.    Promotion

In addition to Plaintiff's infringement contentions, addressed below, Plaintiff challenges

---

[1]      A "bushing" is a cylindrical lining designed to reduce friction and wear inside a hole.

certain statements Defendants have made in advertisements for the QD1 and QD2 products. Specifically, Plaintiff asserts that Defendants marketed the QD1 as "The Original Quick Disconnect Stalk Stomper" although they knew that Plaintiff and another manufacturer had sold quick-disconnect stalk stompers before the QD1 was commercially available. (Pl.'s Stmt. of Add'l Facts (hereinafter "Pl.'s Add'l 56.1) [165] ¶ 31.) In addition, Plaintiff says, after Defendants stopped advertising QD1 as "The Original" in May 2014 while this suit was pending, they began a new campaign for the QD2 that again holds out the QD1 as the original quick-disconnect stalk stomper, announcing "This design change replaces a major change we introduced three years ago with the earliest quick disconnect." (*Id.* ¶ 34.) Plaintiff contends this conduct constitutes false advertising and violates (1) the federal Lanham Act, 15 U.S.C. § 1125(a); the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), 815 Ill. Comp. Stat. 510/2; and (3) the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/2.

Defendants deny that the advertisements contain any false statements or that they actually deceived any consumers. According to Defendants, all of their stalk stomper products, regardless of the products' individual features, are marketed as "THE ORIGINAL" because Defendants were the first company to introduce stalk stompers, decades ago. In addition, Defendants note that they were the first to refer to their stalk stomper products using the term "quick disconnect." Thus, Defendants contend, their use of the term "The Original" was not literally false. With respect to the advertisement for the QD2, Defendants respond that the advertisement merely states that the QD1 was *their* earliest quick-disconnect product and thus makes no representation, let alone a false representation, about whether the QD1 was made available prior to any other company's quick-disconnect product. (Defs.' Reply to Pl.'s 56.1 [172] ¶ 31.)

## III.    Infringement Contentions and Claim Construction

The court turns first to Plaintiffs' claims of infringement. Plaintiffs assert that both the

QD1 and QD2 infringe claim 1 of the '432 Patent and claims 6 and 7 of the '963 Patent. Defendants deny that their products infringe any of those claims because, they argue, their products lack certain elements of each claim. The court has already construed a number of the terms in those claims and will provide the court's construction of the disputed terms in parentheses where appropriate. *See Not Dead Yet*, 2015 WL 5829761, at *5–*17.

## A.    Claim 1 of the '432 Patent and the QD1

With respect to claim 1 of the '432 Patent, Defendants maintain that there is no genuine dispute of material fact that the QD1 lacks at least (1) a plate member (a single smooth thin flat sheet of material that may contain minor angles or curves), (2) a plate member having (thereon) a cross bar, or (3) retention means (a block or stop that retains the position of the stalk stomper with respect to the mounting bracket by restricting the longitudinal movement via engagement with a pin member, and equivalents thereof).    Plaintiff insists the QD1 has each of these features.    The C-channel member of the QD1's shoe bracket literally meets the plate member limitation, Plaintiff contends, because it is a single smooth thin flat sheet of material, with what Plaintiff contends is a minor angle (90 degrees) formed by the bracket's sidewalls.    In the alternative, Plaintiff argues that the C-channel member meets the plate member limitation under the doctrine of equivalents.    Plaintiff also maintains that the cross bar held by the QD1 shoe bracket's side walls literally meets the cross bar limitation and that the pin bushings in the holes of the sidewalls constitute retention means because they restrict the bracket's longitudinal movement by engaging with a pin member.

## B.    Claim 1 of the '432 Patent and the QD2

Defendants contend that the QD2 also does not infringe claim 1 of the '432 Patent because there is no genuine dispute of material fact that the product lacks (1) a "pair of holes being generally transversely aligned" and thus also lacks a pin adapted to be received in the holes, as well as (2) a plate member, and thus also lacks a plate member having (thereon) a cross bar and a plate member in a higher place than the pair of holes.    For the same reasons

documented above, Plaintiff contends that the QD2 meets the plate member limitation just as the QD1 does. With regard to the other elements of claim 1 of the '432 Patent, Plaintiff concedes that the QD2 does not literally meet each element. According to Plaintiff, however, certain structures in the QD2 combine to perform the function of elements claimed in the '432 Patent. Specifically, Plaintiff contends that the vertical pin that secures the header bracket to the shoe assembly, the hole that receives the pin, and the recesses that receive the cross bars are functionally "identical to that of the claimed pin, retention means, and bracket arm holes." (Pl.'s Opp'n to Defs.' Mot. for Summ. J. [164] at 10.) Although the structures perform that function in a different way than the patent specifies, Plaintiff maintains that the difference is "insubstantial." (*Id.*)

### C. Claims 6 and 7 of the '963 Patent and the QD1

Defendants contend that the QD1 does not infringe claims 6 and 7 of the '963 Patent because it lacks a retention member (a block or stop that retains the position of the stalk stomper with respect to the mounting bracket by restricting the longitudinal movement via engagement with a pin member, and equivalents thereof). Plaintiff responds, as it does with respect to the '432 Patent, that the pin bushing in the holes of the QD1's shoe bracket's side walls is a retention member—if not literally, then under the doctrine of equivalents.

### D. Claims 6 and 7 of the '963 Patent and the QD2

With respect to the QD2, Defendants maintain that the device does not infringe claims 6 and 7 of the '963 Patent because the device lacks (1) transversely aligned holes in the first and second arm members of the device's header bracket, (2) a pin adapted to be received in the pair of holes, and (3) a retention member. As with the '432 Patent, Plaintiff does not contend that the QD2 literally meets each claimed element of the '963 Patent. Yet Plaintiff does maintain that the QD2 meets each element under the doctrine of equivalents. According to Plaintiff, the combination of a hole in the upper portion of the header bracket and a pair of transverse recesses in the arm members serves the same function as the claimed pair of holes

in the first and second arm members. Plaintiff also argues that the vertical pin member of the QD2 is the functional equivalent of the claimed pin member and that the material defining the hole in the top of the device's shoe assembly, which engages the pin member, constitutes a retention means.

### III.  Prosecution History of the '963 Patent

Plaintiff brought this suit in May 2013, asserting a single count for infringement of the '432 Patent.  (*See* Compl. [1].)  In June 2013, on behalf of Shoup, Plaintiff's counsel filed an application (the '353 application) with the USPTO that eventually matured into the '963 Patent. (Defs.' Add'l Stmt. of Mat Facts in Supp. of its Resp. to Pl.'s Mot. for Summ. J. [168] (hereinafter "Defs.' Add'l 56.1") ¶ 4.)  Plaintiff identified the application as a continuation of an application Plaintiff had filed on March 14, 2013.  (*Id.* ¶ 6.)  As a continuation-in-part application, patent claims resulting from the '353 application are entitled to the filing date of the earlier (parent) application as long as the claimed invention is described in the parent specification in sufficient detail.  *See Therma-Tru Corp. v. Peachtree Doors Inc.*, 44 F.3d 988, 992 (Fed. Cir. 1995). Thus, to the extent the application filed in March 2013 adequately described the invention claimed by the '963 Patent, the '963 Patent claims would be entitled to a filing date of March 14, 2013.  Importantly, however, from the time Plaintiff filed the '353 application through the date that the '963 Patent issued, Plaintiff never claimed that the '353 application was a continuation of the '432 Patent, which has a filing date of July 19, 2011.  (Pl.'s 56.1 ¶¶ 46, 49.)  In addition, when Plaintiff filed an Information Disclosure Statement[2] with the USPTO in connection with the '353 application, that statement made no reference to Plaintiff's first public display of its stalk stomper, which took place in August 2010, or to Defendants' first offering for sale of the QD1,

---

[2]      Individuals associated with the filing and prosecution of a patent application have a duty to disclose to the patent office "all information known to that individual to be material to patentability."  37 C.F.R. § 1.56(a). Patent applicants can satisfy that duty by filing information disclosure statements, which must include (1) a list of all patents, publications, applications, or other information submitted for consideration by the office; (2) a legible copy of each submitted document; and (3) a concise explanation of the relevance of listed documents that are not in the English language.  37 C.F.R. § 1.98(a).

which took place in June 2011. (Defs.' 56.1 ¶ 7.) Defendants contend the disclosure was incomplete; they maintain that Plaintiff's first stalk stomper and the QD1 constitute prior art for the invention claimed in the '963 Patent because both products were disclosed more than one year prior to the March 14, 2013 filing date. *See* 35 U.S.C. § 102(b).

In September 2013, Defendants filed a petition with the USPTO for *inter partes* review of the '432 Patent, arguing that the prior art disclosed each limitation of the claims in the '432 Patent and that the claims were thus unpatentable. (Pl.'s Add'l 56.1 ¶ 24.) In March 2014, the USPTO's Patent Trial and Appeal Board ("PTAB") denied Defendants' petition. (*Id.* ¶ 25.) Before the PTAB denied the petition but after the parties had briefed certain issues in connection with the *inter partes* review of the '432 Patent, Plaintiff filed a voluntary supplemental amendment to the '353 application. (Def.'s 56.1 ¶ 14.) Prior to that amendment, each proposed claim in the application referenced a "torsion spring." The amendment deleted references to a torsion spring in certain claims and added the proposed claims that would become claims 6 and 7 of the '963 Patent. (*Id.*) The USPTO issued the '963 Patent on June 10, 2014. (Pl.'s 56.1 ¶ 7.) On June 26, 2014, Plaintiff filed its Second Amended Complaint, alleging that the QD1 and QD2 infringed the recently-issued '963 Patent. (*See* 2nd Am. Compl. [52] ¶¶ 95–107.) In their answer filed on July 25, 2014, Defendants asserted that because the effective filing date for the '963 Patent was March 14, 2013, the '963 Patent was invalid based on the 2010 early sales of Plaintiff's stalk stomper and the 2011 QD1 sales. (Pl.'s 56.1 ¶ 50.)

Days after Defendants' answer was filed, on July 31, 2014, Plaintiff submitted a petition to the USPTO seeking to "correct" the priority claim of the '963 Patent to the earliest filing date for the '432 Patent—that is, July 19, 2011. (*Id.* ¶ 53.) In support of that petition, Plaintiff's counsel signed a certification stating that Plaintiff's failure to claim priority for the '963 Patent to the '432 Patent by the time the claim was due under 37 C.F.R. § 1.78 was unintentional. (Defs.' Add'l 56.1. ¶ 14.) On February 10, 2015, USPTO issued a Certificate of Correction, amending the '963 Patent to state that the application to which the '353 application initially claimed priority

was itself a continuation-in-part of another application that was a continuation-in-part of the application that matured into the '432 Patent, which has a filing date of July 19, 2011. (Certificate of Correction, Ex. B to Pl.'s 56.1 [152-3] at 15.)

The fact that Plaintiff sought and received a Certificate of Correction is undisputed. What is disputed is whether Plaintiff actually intended all along to claim priority for the '963 Patent to the application for the '432 Patent. Plaintiff maintains that it "intended at the time of filing [the '353 application] to claim priority to [the application for the '432 Patent]." (Pl.'s 56.1 ¶ 47.) Shoup testified that Plaintiff's counsel called him and "said they had made a mistake and that he had corrected it," and that the mistake was that the '353 application "didn't tie everything that we had done to the very first application." (Dep. of Kenneth Shoup (hereinafter "Shoup Dep."), Ex. O to Pl.'s 56.1 [152-16], 49:19–20. 50:4–5.) According to Shoup, "the intent" was to "tie the patents together" because "there would be no reason not to." (*Id.* 50:7–8, 51:7–8.) By affidavit, Shoup asserts that "it has always been [his] practice to claim priority to the earliest in a chain of applications" and that the failure to do so in this instance "was due to a clerical error." (Decl. of Kenneth Shoup (hereinafter "Shoup Decl."), Ex. Y to Pl.'s 56.1 [152-26], ¶¶ 10–11.)

Defendants are skeptical of this account: They contend that Plaintiff had no intention to claim priority back to the filing date for the '432 Patent at the time it submitted the '353 application. According to Defendants, Plaintiff would gain no legal advantage by securing the earlier filing date because each claim in the '353 application, at the time it was filed, contained a "torsion spring" limitation, meaning that the earliest effective filing date for those claims would be March 14, 2013 whether or not the application claimed back to the filing date for the '432 Patent. (*See* Defs.' Add'l 56.1 ¶¶ 16–17, 19.) In fact, Defendants contend, Plaintiff is disadvantaged in claiming an earlier filing date because doing so would shorten the term of the '963 Patent by nearly two years. *See* 35 U.S.C. § 154(a)(2). According to Defendants, the earlier filing date only became legally advantageous for Plaintiff once it filed the supplemental amendment to remove the "torsion spring" references from certain claims in an effort to broaden

the scope of the '963 Patent to assert its claims in this litigation.

The prosecution history of the '963 Patent, Defendants argue, reveals that Plaintiff or its counsel failed to fulfill their duty of candor and good faith toward the USPTO. *See* 37 C.F.R. § 1.56 ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section."). Defendants contend that Plaintiff engaged in inequitable conduct, in violation of the duty of candor and good faith, by (1) failing to disclose prior art—namely the early sales of the QD1 and of Plaintiff's own stalk stomper (the "early sales")—and (2) falsely stating to the USPTO that the failure to timely claim priority to the earlier filing date was unintentional. In support of their contention, Defendants note that because the effective filing date of claim 1 of the '963 Patent is March 14, 2013 (Defs.' Add'l 56.1 ¶ 19), Plaintiff should have known the early sales were prior art for at least that claim yet still failed to disclose them. In addition, Defendants note that neither Plaintiff nor its counsel notified the USPTO of this litigation, or of the petition for *inter partes* review of the '432 Patent, at any point during the prosecution of the '963 Patent.

As discussed above, Plaintiff maintains that it always intended to seek priority to the application for the '432 Patent and it therefore did not believe the early sales were prior art because they were not disclosed until less than a year before the application for the patent. In any event, Plaintiff contends, even if it were true that there was a failure to disclose this information, there is no evidence that the alleged omissions were material to patentability or were the result of any intent on the part of Plaintiff or its counsel to deceive the USPTO.

## DISCUSSION

Both sides have moved for summary judgment. Plaintiff seeks judgment on its claims that the QD1 literally infringes claims 6 and 7 of the '963 Patent and claim 1 of the '432 Patent; it also seeks judgment against Defendants on their affirmative defenses of indefiniteness,

anticipation, and inequitable conduct with respect to claims 6 and 7 of the '963 Patent. Defendants seek summary judgment on Plaintiff's false advertising claims, as well as a judgment that neither patent is infringed by the QD1 or the QD2, and the '963 Patent is invalid for inequitable conduct.  A court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether the moving party is entitled to judgment as a matter of law, a court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Tolan v. Cotton*, 134 S. Ct. 1861 (2014).

To determine whether a product infringes a patent claim, a court must first determine the correct claim scope and then compare "the properly construed claim to the accused device to determine whether all of the claim limitations are present either literally or by a substantial equivalent."  *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002).  Each element of the claim, or its equivalent, must be present in the accused device to establish infringement.  *Id.*  "[A]lthough equivalence is a factual matter normally reserved for a factfinder, the trial court should grant summary judgment in any case where no reasonable factfinder could find equivalence."  *Id.*

I.    **Infringement of the '432 Patent by the QD1 Product**

Both sides have moved for summary judgment on the issue of whether the QD1 infringes the '432 Patent.  The parties dispute whether the QD1 contains the following claimed elements:  (1) a plate member with a cross bar thereon, (2) a retention means consisting of a block or stop, and (3) a substantial portion of the plate member position above the pair of holes that receive a pin.  Because there are genuine disputes of material fact concerning these elements, the court denies both parties' motions for summary judgment with respect to the

QD1's alleged infringement of the '432 Patent.

A.    Plate Member with a Cross Bar Thereon

With respect to the plate member limitation, Plaintiff argues that the QD1's C-channel member, which has two side walls that form 90-degree angles with the bracket's flat top surface, constitutes a plate member.  Defendants respond by pointing to the court's construction of "plate member" as "a single smooth thin flat sheet of material that may contain minor angles or curves," and they insist that the C-channel cannot be a plate member because its 90-degree angles are not "minor" angles or curves.   According to Plaintiff and its expert, the record supports a conclusion that the bends in the C-channel member are "minor" because the bends do not affect the function of the bracket (to connect to the header bracket and support the other components of the stalk stomper assembly) and because prior art depicts components labeled "plates" that themselves have curves that appear to be roughly 90 degrees.  (*See, e.g.*, Decl. of Larry Johnson in Supp. of Pl.'s Mot. for Summ. J. (hereinafter "Johnson Decl."), Ex. D. to Pl.'s 56.1 [152-5], ¶¶ 44–50, 57.)

The court concludes that, despite the opinion of Plaintiff's expert, the prior claim construction ruling effectively forecloses a finding that a structure like the C-channel member could literally constitute a "plate member."   In rejecting Plaintiff's proposed construction of "plate" as an "upper support structure" comprising "a generally planar upper portion," the court noted that it would be incorrect to call a box-shaped support structure comprised of four distinct sides a plate, even if the structure contained a generally planar upper portion.  *Not Dead Yet*, 2015 WL 5829761, at *6.  "Rather, it would be more accurate to call each individual side of the box a 'plate.'"  *Id.*  The QD1's shoe bracket is fairly understood as a box-shaped structure with a missing bottom side.  It would thus be inaccurate to call the entire structure a plate, and the court's determination that a plate could include "minor" angles clearly did not contemplate that a box-shaped structure, albeit one with just three sides, would be considered a plate.  The C-channel member does not literally meet the court's construction of "plate member."

16

There is, however, a genuine dispute of material fact about whether the "plate member" element is met under the doctrine of equivalents. "[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997). A product infringes under the doctrine of equivalents "if each element of the accused device performs substantially the same function, in substantially the same way, to achieve substantially the same result." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1317 (Fed. Cir. 2003). Plaintiff argues that the shoe bracket's C-channel performs the same function as the claimed plate member, in substantially the same way, to achieve the same result. According to Plaintiff, (1) the component's function is the same as the plate member—to allow the stalk stomper assembly to be secured to the mounting bracket and to support the other components of the assembly; (2) it works the same way as the plate member—a cross bar is placed in recesses, a substantial portion of which is positioned above holes in the bracket, which are aligned with the retention means, and a pin is inserted; and (3) the result (a stalk stomper assembly secured to the mounting bracket) is the same. Defendants' only response to Plaintiff's argument on this point is that the QD1's shoe bracket does not work in the same way as the plate member because the QD1 can be retained vertically without the need of a pin. As Plaintiff points out, however, the QD1 does include a pin when fully assembled and the pin is necessary to prevent vertical and longitudinal movement. There is thus a genuine dispute about whether the shoe bracket functions in the same way as the claimed plate member (*see, e.g.*, Pl.'s 56.1 ¶ 31; Defs.' 56.1 ¶ 5), and therefore whether the QD1 meets the plate member limitation under the doctrine of equivalents. *See Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1370–71 (Fed. Cir. 2001) ("Infringement under the doctrine of equivalents requires an intensive factual inquiry[, and summary judgment is appropriate only where] the record . . . leaves no room for a reasonable jury to find

equivalence.").

With respect to whether the QD1 has a plate member with a "cross bar thereon," Defendants largely repeat their arguments regarding a plate member: (1) the limitation is not met literally because the cylindrical rod found on the QD1 is not contained on a plate member (smooth thin flat sheet of material) but instead extends through the sidewalls of the shoe bracket and (2) the cylindrical rod is not an equivalent for the cross bar because its positioning allows the QD1's shoe assembly to be retained vertically without need of a pin, unlike the claimed plate member with a cross bar, which requires a pin. For the reasons just discussed, the court agrees that the QD1 does not literally have a "plate member" with a cross bar thereon, but there is a genuine dispute of material fact about whether the cylindrical rod that extends through the sidewalls of the shoe bracket is an equivalent of the cross bar on the claimed plate member.

**B.      Retention Means**

The court adopted the following construction of retention means: "a block or stop that retains the position of the stalk stomper with respect to the mounting bracket by restricting the longitudinal movement via engagement with a pin member, and equivalents thereof." *Not Dead Yet*, 2015 WL 5829761, at *11. The court also determined that claim 1 of the '432 Patent required the retention means to be "physically in contact with and supported by the surface of the plate member." *Id.* In arguing that the QD1 includes this element, Plaintiff points to the pin bushings in the holes (or alternatively, the material forming the holes themselves) of the side walls of the QD1's shoe bracket. According to Plaintiff, the pin bushing constitutes a "stop," and when the QD1 is assembled, a pin, inserted in the pin bushing, prevents longitudinal movement of the shoe bracket relative to the mounting bracket during use of the device. (Pl.'s 56.1 ¶ 18.) In addition, Plaintiff contends that the pin bushing is "physically in contact with and supported by the surface of the plate member" because each pin bushing is in contact with and welded to the annular surface of the C-channel member through that member's holes. (*Id.* ¶ 28.) Defendants argue that the QD1 lacks such a retention means. They urge that each hole in the sidewall of

the C-channel member is a "hollow place in a solid body" and is thus a "through-hole" for a pin, not a block or stop. (Defs.' Mem. of Law Supp. Mot. for Summ. J. (hereinafter Defs.' SJ Mem.) [155] 13.) According to Defendants, therefore, the pin bushing in the QD1 merely acts as an insert for the through-hole to make it easier to guide the pin through the holes. In addition, because the holes and pin bushings are supported by the sidewalls, which Defendants contend are not part of a plate member, neither the holes nor the pin bushings can be retention means "in contact with or supported by the surface of the plate member." The court has already determined that a reasonable jury could find that the QD1's C-channel member is the equivalent of a plate member, however. A reasonable jury could therefore also conclude that the QD1's pin bushings are in contact with and supported by the surface of the equivalent of a plate member. The court also concludes that whether the pin bushing constitutes "a stop," or its equivalent, that retains the stalk stomper's position in the same way that the claimed plate member does is a question of fact for the jury and that a reasonable jury could find that the pin bushing literally meets the retention means limitation or is otherwise an equivalent.

**C.    Substantial Portion of Plate Member above Pair of Holes**

In its claim construction ruling, the court interpreted a "whereby" clause in claim 1 of the '432 Patent as requiring "a substantial portion of the plate member [to be] in a higher place than the pair of holes" on the plate member. *Not Dead Yet*, 2015 WL 5829761, at *16. In reaching that determination, the court noted that the pin inserted into the pair of holes could only perform its function of providing support for the stalk stomper if the pin were positioned "under" the plate member. *Id.* at *15. Yet the court also noted that the preferred embodiment of the invention in the '432 Patent showed a portion of the plate member below the holes and the inserted pin member. *See id.* (including the picture below, to which the court added a circle on the left side highlighting the holes and pin member and a circle on the right side highlighting the portion of the plate member that is below the holes and pin member).



The court thus concluded that claim 1 of the patent only required a substantial portion of the plate member to be above the pair of holes. Plaintiff maintains that the QD1 meets this limitation because approximately two-thirds of the C-channel member is above the holes in the side walls:



Pin is inserted within holes of header bracket

(Pl.'s 56.1 ¶ 29.) The shaded portion in the above figure is the portion Plaintiff contends is above the claimed pair of holes and constitutes approximately two-thirds of the C-channel member. Defendants argue that Plaintiff's position is inconsistent with the court's claim construction ruling. That construction, Defendants assert, was based on the understanding that a substantial portion of the plate member would have its "bottom edges" positioned above the hole, as depicted in the preferred embodiment of the '432 Patent; the bottom edges of the QD1's C-channel, by contrast, are completely under the pair of holes. (*See* Defs.' SJ Resp. at

6.)  The court disagrees with Defendants that its construction of the "whereby" clause in claim 1 requires some portion of the bottom edges of the plate member (or its equivalent) to be above the pair of holes.  The claim construction ruling does not refer to "bottom edges."  In addition, the court determined that the whereby clause provided a limitation only with respect to the function of the "retention means," *Not Dead Yet*,  2015 WL 5829761, at *16, and the court has already concluded above that a reasonable jury could find that the QD1 contains structures that meet the retention means limitation.  The fact that some portion of what is potentially equivalent to the plate member is below the pair of holes, while at the same time a substantial portion remains above the holes, does not interfere with the function of the proposed retention means. The court therefore determines that, to the extent a reasonable jury would find that the plate member limitation is met under the doctrine of equivalents, the jury could also conclude that a substantial portion of that equivalent member is positioned above the pair of holes.

## II.    Infringement of the '963 Patent by the QD1 Product

Both sides also move for summary judgment on the issue of whether the QD1 infringes claims 6 and 7 of the '963 Patent.  On this issue, the parties' primary dispute is about whether the QD1 lacks the claimed "retention member."  In the claim construction ruling, the court adopted the same construction for "retention member" in the '963 Patent as it did for "retention means" in the '432 Patent:  "a block or stop that retains the position of the stalk stomper with respect to the mounting bracket by restricting the longitudinal movement via engagement with a pin member, and equivalents thereof."  *Not Dead Yet Mfg.*, 2015 WL 5829761, at *12.  The parties' arguments with respect to the claimed retention member therefore mirror the arguments made concerning "retention means," and the court's ruling is the same.  The record contains sufficient evidence from a which a jury could conclude that the QD1's pin bushing literally meets, or is the equivalent of, the claimed retention means, though the evidence is not so overwhelming that the court can find infringement as a matter of law.  The court thus denies both parties' motions for summary judgment with respect to the QD1's infringement of the '963

Patent.

## III.    Infringement of the Patents by the QD2 Product

Defendants move for summary judgment of non-infringement by the QD2 product with respect to both patents at issue.  Plaintiff concedes that the QD2 does not literally infringe either patent but asserts that the product infringes both patents under the doctrine of equivalents.  Defendants maintain that the QD2 lacks a number of claimed elements even under the doctrine of equivalents.  With respect to the '432 Patent, Defendants argue that the QD2 lacks the claimed "pair of holes in the bracket spaced from the recesses, the pair of holes being generally transversely aligned," and thus also lacks the "pin adapted to be received in the holes."  ('432 Patent, col. 4., ll. 62–65.)  In addition, as they do with respect to the QD1, Defendants argue that the QD2 lacks a plate member with a cross bar thereon, as well as a retention means (consisting of a block or stop).  Defendants contend that similar elements from the '963 are lacking in the QD2.  Specifically, they argue that the QD2 lacks the claimed "hole[s] [in the bracket's arm members] spaced from the recesses, the holes of the first and second arm members being generally transversely aligned," and thus also lacks the "pin member configured to be received within the first and second arm member holes."  ('963 Patent, col. 8, ll. 47–57.)  Defendants also argue that the QD2 lacks a retention member (consisting of a block or stop).

As described above, both of the patents at issue contain limitations regarding a pair of transversely aligned holes in a bracket and a pin to be received in those holes.  Plaintiff argues that the QD2 meets these limitations under the doctrine of equivalents.  According to Plaintiff, the function of the claimed pin and transversely aligned holes is to provide vertical support for the stalk stomper assembly when it is secured to the mounting bracket and to lock the longitudinal positions of the mounting bracket and the upper portion of the stalk stomper assembly.  (Pl.'s Add'l 56.1 ¶ 4.)  Plaintiff argues that a second cross bar and transverse recesses in the QD2 serve the function of providing vertical support for the stalk stomper assembly, while a hole or concave recess in the upper portion of the QD2's mounting bracket is

adapted to engage a pin member and serves the function of locking the longitudinal positions of the mounting bracket and the shoe assembly. (*Id.* ¶¶ 5–6.) Thus, according to Plaintiff, "the functions and result of the vertical pin and hole/recess and the second cross bar/recess arrangement are identical to that of the claimed pin, retention means, and bracket arm member holes." (Pl.'s Opp'n to Defs.' Mot. for Summ. J at 10.)

Whatever merit there may be in Plaintiff's arguments in the abstract, Defendant contends Plaintiff is estopped from making them. In light of the positions that Plaintiff took in the prosecution of the '432 Patent, Defendants maintain that Plaintiff may not now argue that the recesses in the QD2 are the equivalent of "holes" or that the QD2's spring-biased vertical pin is the equivalent of the claimed pin to be received in the holes. "[P]rosecution history estoppel limits the range of equivalents available to a patentee by preventing recapture of subject matter surrendered during prosecution of the patent." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995). Whether prosecution history estoppel applies is a question of law. *Id.* Where the purported estoppel is based on a patentee's voluntary amendment of a claim, estoppel is straightforward. In a situation like this one, however, where a claim of estoppel rests on arguments the patentee made during prosecution, "the prosecution history must evince a clear and unmistakable surrender of subject matter." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1364 (Fed. Cir. 2006). If a patentee makes an argument regarding one claim term that generates an estoppel, "the estoppel will apply to that term in other claims." *Southwall Techs.*, 54 F.3d at 1584; *see also Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1323 (Fed. Cir. 2013) ("Prosecution history estoppel can extend from a parent application to subsequent patents in the same lineage.").

The court agrees with Defendants that Plaintiff is estopped from arguing that the QD2's recesses and vertical pin are the equivalents, respectively, of the holes and pin members claimed in the '432 and '963 Patents. In response to an *inter partes* review petition, Plaintiff distinguished "holes" from "recesses," noting that in the '432 Patent, "[w]hen an enclosed

23

structure was intended to be claimed, 'hole' was used, whereas when an open notch was intended, 'recess' was used." (Pl.'s Preliminary Resp. to Pet. for *Inter Partes* Review, Ex. C to Jt. Appendix [69-3], at 185–86.) In that same filing, Plaintiff proceeded to distinguish the '432 Patent from prior art, arguing that another invention's "disclosed cavities are not 'holes.' They are open, non-enclosed notches, and do not meet the proper construction of 'holes.'" (*Id.* at 197.) Earlier in the filing Plaintiff had explained that the claimed holes must be enclosed because they are "through holes into which a pin may be guided." (*Id.* at 185.) Based on those express statements in the prosecution history, it is clear and unmistakable that Plaintiff surrendered the possibility that a non-enclosed notch, such as the recesses found in the QD2, could function as the equivalent of the patents' claimed holes.

Plaintiff's statements with respect to the claimed pin member similarly evince a clear and unmistakable surrender. In the same filing from the *inter partes* review proceedings, Plaintiff took the position that a spring-pressed pin found in another invention did not correspond to the claimed pin in the '432 Patent because the '432 Patent "require[] that the pin engages *a pair of holes in the spaced bracket arms.*" (*Id.* at 212 (emphasis in original).) The spring-pressed pin *was distinguishable, Plaintiff argued, because it did not engage a pair of holes; rather, it* "engage[d] only one aperture in a side plate." (*Id.*) Plaintiff's express statements make clear that it surrendered the possibility that a pin that does not engage in a pair of holes could be an equivalent to the pin claimed in the '432 Patent and the '963 Patent. Thus, with respect to two claimed elements of the '432 Patent and the '963 Patent, Plaintiff's infringement contentions for the QD2 product rely on doctrine-of-equivalents arguments that it is estopped from making.

Plaintiff resists this conclusion. According to Plaintiff, the arguments from the prosecution history referenced above are mere "isolated statements." (Pl.'s Opp'n to Defs.' Mot. for Summ. J at 11.) Plaintiff highlights other arguments made in the *inter partes* response to distinguish the claimed elements from the prior art. Those other arguments, Plaintiff urges, show that Plaintiff was not distinguishing holes from recesses or pins engaged with holes from

pins engaged with a single aperture but was "distinguishing the overall method" of the prior art. *AquaTex Indus., Inc. v. Techniche Sols.*, 419 F.3d 1374, 1383 (Fed. Cir. 2005) (finding patentee did not clearly surrender specific subject matter by distinguishing overall method by which prior art worked). But the statements referenced above speak for themselves and do not appear to be taken out of context; as the court reads those statements, they are clear attempts to distinguish subject matter found in the QD2. It does not matter that Plaintiff made additional arguments to distinguish prior art. "Where a patent applicant sets forth multiple bases to distinguish between its invention and the cited prior art, the separate arguments can create separate estoppels." *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1367 (Fed. Cir. 2007) (internal quotation marks and emendations omitted).

Nor does it matter whether the examiner in the *inter partes* proceeding actually relied on the arguments cited by Defendants in reaching his conclusion. An assertion made during prosecution may create an estoppel "whether or not [it was] actually required to secure allowance of the claim . . . because the relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Id.* (internal quotation marks and emendations omitted). Plaintiff contends that arguments that the examiner did not rely on cannot be a basis for estoppel, but the case Plaintiff cites does not so hold. *See TriVascular, Inc. v. Samuels*, 812 F.3d 1056 (Fed. Cir. 2016). *TriVascular* involved inventions in the field of medical stent devices. In that case, after the patent examiner had initially rejected the patentee's claims because prior art included a device with "'inflatable protrustions' that form a 'circumferential ridge'," the patentee attempted to distinguish the prior art by proposing an amendment with a new limitation ("*continuously* circumferential ridges") on one of the claims in his application. *Id.* at 1064. After a telephone interview with the patent examiner, however, the patentee and the examiner apparently changed their positions on the need for the amendment; the examiner thus deleted the amendment and approved the claims without the inserted "continuously" limitation. *Id.* at 1065. Thus because the proposed amendment was not

ultimately adopted and there appeared to be change of position by both the examiner and the patentee after the amendment was proposed, it was "difficult to see how a skilled artisan could interpret the proposed amendment as a disclaimer required for patentability." *Id.* at 1064. In the case before this court, in contrast, there is no indication that Plaintiff or the examiner changed their positions in the middle of the prosecution history or that the examiner, or any other person of ordinary skill in the art, would have any reason to believe that Plaintiff had disclaimed reliance on the arguments it advanced to distinguish prior art.

Finally, Plaintiff points to the opinion of its expert, Dr. Larry Johnson, who opines that a person of ordinary skill in the art would not have considered Plaintiff's statements to constitute a disclaimer. Plaintiff notes that Defendants offered no expert opinion of their own regarding what would have been considered by a person of ordinary skill in the art. As an initial matter, the court notes that Dr. Johnson's opinions regarding Plaintiff's arguments in the *inter partes* proceeding were not disclosed in any expert report, and relying on those opinions might therefore unfairly prejudice Defendants. But in any event, as noted above, the issue of prosecution history estoppel is a question of law to be determined by the court, and whether Plaintiff surrendered the subject matter at issue is easy enough to "determine from the prosecution history record without the introduction of additional evidence." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1370 (Fed. Cir. 2003). An "expert's testimony as to what a reasonable competitor would conclude from the prosecution history cannot create a genuine issue of material fact so as to bar summary judgment" on an issue of prosecution history estoppel. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1254 (Fed. Cir. 2000).

The court concludes that Plaintiff's claim of infringement against the QD2 rests on interpretations of the patent that Plaintiff surrendered. Defendants' motion for summary judgment of noninfringement for this product is granted.

## IV. Invalidity of Either Patent for Indefiniteness

Plaintiff moves for summary judgment on Defendants' contentions that the '432 Patent and the '963 Patent are invalid for indefiniteness. Defendants contend that the term "retention means" recited in the '432 Patent and the terms "retention member" and "support member" recited in the '963 Patent are irreconcilably vague and indefinite, rendering invalid the claims reciting those terms. Plaintiff points out that the court has already construed the terms "retention means" and "retention member," thereby implicitly rejecting Defendants' indefiniteness defense with respect to those terms. The court agrees that its prior ruling is at odds with Defendants' assertion of indefiniteness. "[O]nly claims *not amenable to construction* or insolubly ambiguous are indefinite." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008) (emphasis added). By construing the terms "retention means" and "retention member," the court has already ruled out the possibility that they are indefinite under 35 U.S.C. § 112.

With respect to the term "support member," Plaintiff argues that the term could not possibly be indefinite because the term has a clear ordinary meaning, the patent claims specify particular features of the support member, and the patent's specification provides an example of a corresponding support member. Defendants do not respond directly to Plaintiff's argument but instead argue that claims 6 and 7 of the '963 Patent do not comply with the written description requirement of 35 U.S.C. § 112 with respect to the term "support member." (Defs.' Mem. of Law Opposing Pl.'s Mot. for Part. Summ. J. (hereinafter "Defs.' SJ Resp.") [167] at 13–14.) Plaintiff contends that Defendants have waived this "written description" argument because they failed to identify it in their invalidity contentions. Again, the court agrees. The written description requirement of 35 U.S.C. § 112(a) is distinct from the issue of indefiniteness, which is governed by 35 U.S.C. § 112(b). *See In re Packard*, 751 F.3d 1307, 1314 (Fed. Cir. 2014) (addressing the issues separately). The court ruled previously that claims and defenses not supported by the parties' invalidity contentions have been dropped. (*See* Tr. of Proceedings,

Dec. 16, 2015 [130], 5:7–9.)  Because Defendants' indefiniteness defense rests on a ground not disclosed in their invalidity contentions, the court grants Plaintiff's motion for summary judgment on that defense.

## V.     Invalidity of the '963 Patent for Anticipation

Plaintiff moves for summary judgment on Defendants' contention that claims 6 and 7 of the '963 Patent are invalid for anticipation. Defendants' anticipation defense rests on their assertion that the early sales of the QD1 and Plaintiff's own quick connect-disconnect stalk stomper were anticipatory public disclosures under 35 U.S.C. § 102(a).  Plaintiff denies that the early sales constitute prior art, noting that both the QD1 and Plaintiff's product were disclosed less than one year before the effective filing date of the '963 Patent—according to Plaintiff, July 19, 2011, the filing date of the '432 Patent.  *See* 35 U.S.C. § 102(b) (disclosures made less than one year prior to effective filing date shall not be prior art under certain conditions).  Defendants maintain that the early sales are prior art because the effective filing date for claims 6 and 7 of the '963 Patent is actually much later, either March 14, 2013 or June 26, 2013.  Whether Defendants can proceed with their anticipation defense thus depends on whether claims 6 and 7 of the '963 Patent are entitled to the effective filing date of the '432 Patent.  The court concludes that the claims are not entitled to that earlier filing date and therefore denies Plaintiff's motion for summary judgment on Defendants' anticipation defense.

"It is elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112."  *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008).  This means that the patentee can invoke the earlier application date only if the earlier application provides an adequate written description of the invention at issue:  that is, "the prior application must indicate to a person skilled in the art that the inventor was in possession of the invention as later claimed."  *Id.* (internal quotation marks omitted). Although compliance with the written description

requirement is a question of fact, a court may grant summary judgment on the issue "where no reasonable fact finder could return a verdict for the non-moving party." *Id.* at 1307. Because the '963 Patent resulted from a continuation-in-part application, each of its claims may have different effective filing dates. *See Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1302 (Fed. Cir. 1999). If the subject matter in one of the claims "arises for the first time in the [continuation-in-part] application, [that claim] does not receive the benefit of the filing date of the parent application." *Id.* Defendants argue, among other things, that the term "support member," which is recited in claims 6 and 7 of the '963 Patent, lacks written description in the '432 Patent and that those claims are therefore not entitled to the '432 Patent's earlier filing date.

The court understands Plaintiff to offer three arguments why claims 6 and 7 of the '963 Patent are indeed entitled to the effective filing date of the '432 Patent. First, Plaintiff argues that Defendants violated the Local Patent Rules by failing to disclose this element of their defense and that the defense should be stricken as a result. The court disagrees. Plaintiff does not point to any specific provision of the Local Patent Rules to support its assertion that Defendants were required to identify contentions regarding effective filing dates. In any event, Defendants notified Plaintiff by letter, prior to the filing of their final invalidity contentions, that they intended to argue that claims 6 and 7 were not entitled to the earlier filing date of the '432 Patent. (*See* Letter from Dustin DuFault, Ex. BB to Pl.'s 56.1 [152-29], at 3.)

Second, Plaintiff argues that the '432 Patent's application provides adequate written description of the support member element. As discussed above, Plaintiff contends that a support member should be construed as "a component of a larger assembly that bears some or all of the weight of other components." Plaintiff points to the plate member depicted in certain figures in the '432 Patent and argues that those depictions provide an adequate written description of a support member because the plate member depicted in those figures clearly bears some or all of the weight of other components. Plaintiff's expert offers that same opinion in an affidavit. (*See* Johnson Decl. ¶¶ 108–114.) It is clear from the specification of the '963

Patent, however, that the recited "support member" is meant to be broader than the "plate member" recited in the '432 Patent. *See* '963 Patent, col. 7, ll. 22–25 (referring to embodiment depicted in Figure 10, which showed an "upper support member 215, which *may include* a plate member 226, a cross bar member 229 and a pair of sidewall members 225") (emphasis added). Thus, regardless of the proper construction of "support member" in the '963 Patent, it is clear that "support member" and "plate member" are not identical terms and that a support member may, but need not, include a plate member. As Defendants point out, the patent applicant chooses the language used in claiming an invention, and the claims of the '963 Patent use the term "support member" in lieu of "plate member." (Defs.' SJ. Resp. at 16.) Though the '963 Patent seems to make clear that "support member" is a broader class that may include a "plate member," Plaintiff points to nothing in the '432 Patent application to demonstrate that it possessed, at the time of filing, an invention including support members other than plate members. Rather, each depiction of a structure that acts as a support member takes the form of a plate member. It does not matter that a support member would have been obvious to a person reading the application for the '432 Patent. "Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed. It extends only to that which is disclosed." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571–72 (Fed. Cir. 1997). Plaintiff bears the burden of proving that it is entitled to claim priority to the earlier filing date, *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305–06 (Fed. Cir. 2008), and it failed to carry that burden here.

Third, Plaintiff argues that Defendants' assertion that elements of claims 6 and 7 lack written description in the '432 Patent is "logically at odds with their contention that [Plaintiff's] early sales of its stalk stomper anticipate claims 6 and 7." (Pl.'s Mem. in Supp. of its Mot. for Part. Summ. J. (hereinafter "Pl.'s SJ Mem.") [151] at 17.) Plaintiff reasons that if the early sales of Plaintiff's stalk stomper anticipate claims 6 and 7 of the '963 Patent, then the '432 Patent must provide adequate written description for those claims because the figures depicted in the

'432 Patent are nearly identical to Plaintiff's early stalk stomper. *Cf. Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001) ("[I]t is axiomatic that that which would literally infringe if later anticipates.") But the Federal Circuit has already explained that in some circumstances, an alleged infringer can advance such positions on anticipation and on the appropriate filing date without contradicting themselves. "[D]ifferences exist between the requirement for claim-anticipating disclosures and for claim-supporting disclosures." *Chester v. Miller*, 906 F.2d 1574, 1577 (Fed. Cir. 1990). Thus it is possible for a disclosure to anticipate a later claim but to fail to provide written description for that claim. *Id.* "This apparent anomaly is most likely to occur when the prior art reference discloses a species of a genus sought to be claimed." *Id.* That is the case here: the prior art discloses a plate member, one species of the larger genus of support members. There is therefore "no impermissible anomaly or logical inconsistency" in Defendants' position. *Id.*

The court rejects Plaintiff's position that claims 6 and 7 of the '963 Patent are entitled to the July 19, 2011 filing date and thus also denies that Plaintiff is entitled to summary judgment on Defendants' anticipation defense. Having reached this conclusion, it is unclear to the court whether any genuine factual disputes remain with respect to Defendants' anticipation defense. Defendants do not appear to have sought for summary judgment on this point, arguing in response to Plaintiff's motion only that "[Plaintiff's] *continued assertion* of infringement by Pride's QD1, which was indisputably on sale by July , 2011, *would invalidate* those claims under 35 U.S.C. [§] 102." (Defs.' SJ Resp. at 12 (emphasis added).) Should Defendants believe that the court's conclusion regarding the effective filing date entitles them to judgment on their anticipation defense, the court invites Defendants to file a motion to that effect, to which Plaintiff would have the opportunity to respond.

## VI. Inequitable Conduct in the Prosecution of the '963 Patent

Under Rule 56 of the USPTO rules, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the

Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section." 37 C.F.R. § 1.56(a). That duty of candor and good faith "exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned." *Id.* Failure to disclose information to the USPTO may render a patent unenforceable for inequitable conduct if clear and convincing evidence shows that the patentee "knew of the [information], knew it was material, and made a deliberate decision to withhold it." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011). The Federal Circuit has imposed a "but-for" test for materiality. *See id.* at 1292 ("[Inequitable conduct] should only be applied in instances where the patentee's misconduct resulted in the unfair benefit of receiving an unwarranted claim."). "To prevail on the defense of inequitable conduct, the accused infringer must [also] prove that the applicant misrepresented or omitted material information with the specific intent to deceive the [USPTO]." *Id.* at 1287.

In their answer to Plaintiff's complaint, Defendants raise two separate defenses of inequitable conduct. Defendants assert that the '963 Patent should be held invalid for inequitable conduct because Plaintiff failed to disclose the early sales of its own quick-connect-disconnect stalk stomper or the QD1 as prior art during the prosecution of the application that resulted in the '963 Patent. Defendants also assert that Plaintiff's Petition to Accept an Unintentionally Delayed Claim under 35 U.S.C. § 120, Updated Filing receipt, and Certificate of Correction granted in connection with the '963 Patent should be held invalid for inequitable conduct because Plaintiff falsely stated that its delay in claiming priority for the '963 Patent to the filing date for the '432 Patent was unintentional.

Plaintiff moves for summary judgment on Defendants' inequitable conduct defenses, arguing that Defendants lack evidence to demonstrate that Plaintiff omitted information with a

specific intent to deceive the PTO or that the omitted information was material.[3]  According to Plaintiff, it did not disclose the early sales because it always intended to claim priority to the filing date of the '432 Patent; this means that early sales were disclosed within one year of the effective filing date and are not prior art.  Thus, Plaintiff argues, it was justified in withholding the early sales, and its statement that it unintentionally delayed claiming the earlier priority was accurate.  In support of this account, Plaintiff points to Shoup's statement in his affidavit that "it has always been [his] practice to claim priority to the earliest in a chain of applications" and that the failure to do so in this instance "was due to a clerical error."  (Shoup Decl. ¶¶ 10–11.) Plaintiff also notes that there is no direct evidence that Plaintiff acted with any specific intent to deceive the USPTO or that Plaintiff's alleged omissions made any material difference to the patentability of the '963 Patent or to the USPTO's issuance of a Certificate of Correction.  In addition, Plaintiff faults Defendants for failing to cite *Therasense*, which supplies the governing standard for the materiality and intent elements, and for citing a "sliding scale" test for materiality and intent that was overruled by *Therasense*.

Although Defendants' failure to cite *Therasense* is disappointing, it is immaterial.  The court concludes that Defendants have sufficient evidence to sustain their inequitable conduct defenses even under *Therasense*'s heightened standards of intent and materiality.  At a minimum, a reasonable jury could conclude that Plaintiff's alleged omissions were material in that, but for the omissions, the patent may not have issued.  Plaintiff itself asserts that the QD1 infringes the '963 Patent.  The product thus would certainly be material prior art if, as the court has now concluded, the '963 Patent is not entitled to the effective filing date of the '432 Patent. A reasonable jury could also conclude that had Plaintiff not stated that its delay in seeking the

---

[3]     Plaintiff also urges dismissal of the defenses for deficiencies in Defendants' pleadings.  The court notes that Plaintiff had ample opportunity earlier in the litigation to move to strike the defenses in Defendants' answer, which would have given Defendants the opportunity to amend or supplement their allegations if the court determined they were wanting.  In any event, the court is not persuaded that Defendants' pleadings were inadequate and will thus focus on whether Defendants have amassed sufficient evidence to support their defenses.

earlier filing date for the '963 Patent was unintentional, a Certificate of Correction would not have issued. Such a statement is required in a petition to accept an "unintentionally delayed claim." 37 C.F.R. § 1.78(c)(3).

Nor is the issue of Plaintiff's intent undisputed. Even after *Therasense*, "[t]he specific intent to commit inequitable conduct may be inferred from indirect and circumstantial evidence." *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1351 (Fed. Cir. 2013). It is true that "deceptive intent must be 'the single most reasonable inference drawn from the evidence.'" *Id.* (citing *Therasense*, 649 F.3d at 1290). In this case, the jury could accept Shoup's assertion that he always intended to claim priority to the '432 Patent, but the jury could also draw the reasonable inference from the circumstantial evidence that Plaintiff or its counsel (who is also bound by Rule 56) acted with deceptive intent. The circumstantial evidence could support an inference that Plaintiff or its counsel (1) knew that the application for the '963 Patent did not claim the earlier filing date of the '432 Patent and (2) intentionally withheld information about prior art in an attempt to secure the '963 Patent to assert its claims in this litigation. Regarding the question of whether Plaintiff or its counsel knew that the application did not claim the earlier filing date, the court notes that Plaintiff concedes claim 1 of the '963 Patent contains a "torsion spring" limitation that was not disclosed until the immediate parent of the '963 Patent, the application of which was not filed until March 14, 2013. (Pl.'s Resp. to Defs.' 56.1 [165] ¶ 10.) Plaintiff thus also concedes that the earliest effective filing date of claim 1 of the '963 Patent is March 14, 2013, years after the public use and sale of Plaintiff's initial stalk stomper product and the QD1. (*Id.* ¶ 12.) In addition, Plaintiff does not dispute that prior to the Plaintiff's voluntary supplemental amendment to the application in February 2014, each proposed claim contained a torsion spring limitation. Thus, as Defendants point out, Plaintiff would gain no legal advantage by claiming the earlier filing date; indeed, claiming the earlier filing date would be disadvantageous for Plaintiff because it would shorten the lifetime of the resulting patent. A reasonable jury might therefore infer that failing to claim priority to the '432 Patent was an

intentional choice.

Even if Plaintiff or its counsel knowingly omitted a claim of priority to the '432 Patent, Plaintiff could plausibly assert that it did not disclose the early sales because it believed their lack of a torsion spring made them immaterial (or at least less material than other already-disclosed prior art). As discussed above, however, Plaintiff cannot plausibly claim that the early sales were immaterial once it amended the application to add claims that did not contain a "torsion spring" limitation and that broadened the claimed subject matter (for example, by adding a "support member" limitation), which resulted in the claims that Plaintiff now asserts cover the QD1. If a jury believes that Plaintiff knew the application did not claim the earlier filing date at the time it amended its application (and thus knew that the early sales predated the effective filing date by a number of years), a jury could reasonably infer that Plaintiff or its counsel withheld the early sales in order to deceive the USPTO and secure the claims in the '963 Patent that it would assert in this litigation.

Further support for the inference of deceptive intent comes from Plaintiff's failure to disclose the existence of this litigation during the prosecution of the '963 Patent. As Defendants point out, the law is clear that patentees must disclose related litigation (including litigation involving parent patents) during patent examination, especially litigation that raises charges of validity and inequitable conduct. *See, e.g.*, *Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1362 (Fed. Cir. 2010). But Plaintiff did not bring this litigation to the attention of the patent examiner. (*See* Defs.' 56.1 ¶¶ 13–14.) Plaintiff argues that the examiner handling prosecution of the '963 Patent was aware of the '432 Patent because the same examiner handled prosecution of that patent's application, and the prosecution history of *that* patent reveals a notice of the instant litigation. (Pl.'s Resp. to Defs.' 56.1 ¶ 13.) Plaintiff has not, however, demonstrated that that the patent examiner actually considered, or was aware of, this litigation during the prosecution of the '963 Patent. Moreover, the question is not what the patent examiner knew or could have known; the relevant question for the issue of deceptive

intent is whether Plaintiff fulfilled its obligation to disclose related litigation or was instead engaging in a pattern of withholding information. Evidence that Plaintiff failed to disclose the related litigation despite numerous opportunities to do so further supports the inference that Plaintiff's failure to disclose the early sales, and failure to claim earlier priority until well after the '963 Patent issued, was part of an attempt to deceive the USPTO.

Plaintiff objects that it is inappropriate for Defendants to rely on inequitable conduct theories involving the failure to disclose related litigation or the failure to disclose prior art for claim 1 of the '963 Patent because those theories were not asserted in Defendants' answer or invalidity contentions. As the court understands Defendants' position, however, they are not relying on new theories of inequitable conduct. Rather, Defendants continue to assert inequitable conduct based on Plaintiff's purported failure to disclose material prior art for claims 6 and 7 of the '963 Patent and purported misstatement that the failure to claim the earlier filing date was unintentional. The effective filing date of claim 1 of the '963 Patent and the failure to disclose related litigation are relevant not to independent inequitable conduct theories, but to support an inference of deceptive intent with respect to the inequitable conduct theories Defendants initially pleaded. Defendants are certainly entitled to present evidence that is relevant for establishing the elements of the inequitable conduct theories they have pleaded.

Though Shoup's assertions about the reason Plaintiff withheld the early sales and initially failed to claim the earlier filing date may be accepted by the jury, there is sufficient evidence for the jury to infer that Plaintiff or its counsel acted with deceptive intent by withholding material information. The court therefore denies both parties' motions for summary judgment on the issue of inequitable conduct.

## VII.    False Advertising and Deceptive Practices Claims

Defendants have moved for summary judgment on the claims Plaintiff has brought under the Lanham Act, the IUDTPA, and the ICFA. Defendants argue that those claims must fail because, among other reasons, Plaintiff has failed to present evidence demonstrating that

consumers were actually deceived by Defendants' advertising or that Plaintiff suffered actual injury as a result of any deception. Under the Lanham Act, if a defendant's advertising contains an "actually false" statement, then the plaintiff need not show that the statement actually deceived consumers or was likely to do so. *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999). "But where the statement is literally true or ambiguous, then the plaintiff is obliged to prove that the statement is misleading in context, as demonstrated by actual consumer confusion." *Id.* at 971–72. Plaintiff contends that Defendants' characterization of the QD1 on their website as the "Original" quick disconnect stalk stomper is literally false because other quick-disconnect stalk stompers were commercially available prior to Defendants' introduction of the QD1. Defendants maintain that their advertising was not false because "The Original" is merely branding that Defendants use with all of their stalk stompers, regardless of the products' particular features, as a reminder that May Wes was the first to introduce stalk stomper devices. Thus, according to Defendants, the phrase "The Original" is not a statement about whether the QD1 was the first stalk stomper to include a quick connect-disconnect component. In addition, Defendants note that they were the first to market their stalk stompers as "Quick Disconnect" stalk stompers; Plaintiff, by contrast, refers to its products as having a "quick release" feature. Thus, according to Defendants, even if "The Original" was interpreted as a statement that the QD1 was the first "quick disconnect" stalk stomper, the statement would be literally true because no other stalk stomper had been previously marketed as having a "quick disconnect" feature.

The court concludes that the meaning of "The Original Quick Disconnect Stalk Stomper" is susceptible to more than one reasonable interpretation and is thus ambiguous rather than literally false. *See, e.g.*, *Playtex Prod., LLC v. Munchkin, Inc.*, No. 14-CV-1308 (RJS), 2016 WL 1276450, at *5 (S.D.N.Y. Mar. 29, 2016) ("A claim cannot be literally false if it is susceptible to at least two interpretations."). The phrase at issue is not a "statement in the ordinary sense, because there is no verb." *Schering-Plough Healthcare Prod., Inc. v. Schwarz Pharma, Inc.*,

586 F.3d 500, 513 (7th Cir. 2009).  On the face of the advertisement, therefore, it is difficult to determine whether the phrase means that the QD1 is the first product to contain a quick connect-disconnect feature, whether it was the first product to be marketed as a "quick disconnect" device, or whether the product is just one in a line of stalk stompers branded as "The Original."  Given that ambiguity, Plaintiff was required to prove that the statement was misleading in context by demonstrating actual consumer confusion.  *B. Sanfield*, 168 F.3d at 972.  It has not done so in this case, and therefore its Lanham Act claim must fail.[4]  Plaintiff cites cases in which courts have determined that branding imparted literally false statements, but the messages conveyed by the branding in those cases was much more clearly false than the language at issue here.  *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 15 (7th Cir. 1992) (branding of product as "Ricelyte," when viewed "in the context of Mead's entire promotional campaign," including verbal and pictorial references to rise, conveyed literally false message that product contained rice and rice carbohydrates); *Clorox Co. Puerto Rico v. Procto & Gamble Commercial Co.*, 228 F.3d 24, 36 (1st Cir. 2000) (branding of liquid detergent as "Ace con Blanqueador" (Ace with whitener) conveyed literally false message that product contained whitening agent when it merely contained color enhancer); *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 97 (3d Cir. 2000) (approving district court's injunction of defendant's falsely advertising that its products effectively freshened breath and concluding that defendant should also be enjoined from using trade name "BreathAsure," which falsely tells

---

[4]	Plaintiff also points to an advertising campaign for the QD2, which referred to the QD1 as "the earliest quick disconnect." (Pl.'s 56.1 ¶ 34.)  Defendants argue that Plaintiff waived any argument with respect to that campaign because Plaintiff failed to mention it in the complaint and did not raise the issue until its response to Defendants' motion for summary judgment.  But even if the court assumes that Plaintiff did not waive its reliance on that statement, Plaintiff still could not sustain its Lanham Act claim because that statement is also ambiguous.  As Defendants argue, one could plausibly interpret their reference to the QD1 as the "earliest quick disconnect" to mean that the QD1 was *Defendants'* earliest quick disconnect product.  Plaintiff has failed to present evidence that this ambiguous statement was actually confusing to consumers.  And, as the court discusses in the context of Plaintiff's ICFA and IUDTPA claims, Plaintiff has not demonstrated it suffered any injury as a result of that allegedly misleading statement.

consumers they have assurance of fresher breath when using defendant's product).

Unlike the Lanham Act, the ICFA and IUDTPA do not appear to require plaintiffs to demonstrate actual consumer confusion to establish deception in the absence of a literally false statement. Rather, Illinois courts have determined that "an advertisement is deceptive if it creates the likelihood of deception or has the capacity to deceive." *Garcia v. Overland Bond & Inv. Co.*, 282 Ill. App. 3d 486, 491, 668 N.E.2d 199, 203 (1st Dist. 1996). Assuming, however, that Defendants' advertising did have the capacity to deceive, Plaintiff's ICFA and IUDTPBA claims fail for another reason: Plaintiff has not put forth any evidence to demonstrate that it actually suffered or was likely to suffer any injury attributable to Defendants' allegedly misleading statements. Under the ICFA, "although the Illinois Attorney General can file suit in an effort to stop deceptive advertising without having to prove that anyone has actually been injured, the private plaintiff must establish an injury attributable to the statutory violation." *B. Sanfield*, 168 F.3d 967, 975 (7th Cir. 1999) (citing Illinois law). And to obtain injunctive relief under the IUDTPA, the only relief available under the Act, a private plaintiff must demonstrate a likelihood of future harm. *See* Ill. Comp. Stat. 510/3 ("A person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable."); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 790 F. Supp. 2d 708, 719 (N.D. Ill. 2011); *see also id.* ("A finding that a practice gave rise to 'a likelihood of confusion' does not in itself satisfy this condition.") (citing *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 909 N.E.2d 848, 857 (1st Dist. 2009)). Plaintiff has put forth no evidence demonstrating that Defendants' advertising would confuse consumers about whether the QD1 was the first stalk stomper product to incorporate a quick connect-disconnect feature, let alone evidence demonstrating that any such confusion would have an adverse effect on Plaintiff's sales or otherwise cause harm. Plaintiff's ICFA and IDUTPA claims,

therefore, are dismissed.[5]

## **CONCLUSION**

For the reasons stated above, the court grants Plaintiff's motion [150] and Defendants' motion [154] in part. The court grants summary judgment for Plaintiff on Defendants' indefiniteness defense. The court grants summary judgment for Defendants with respect to infringement of either patent at issue by the QD2 product, as well as on Plaintiff's claims under the Lanham Act, ICFA, and IDUTPA. The court otherwise denies both motions for summary judgment.

ENTER:

Dated: September 19, 2017

_____
REBECCA R. PALLMEYER
United States District Judge

---

[5] Plaintiff maintains that it need not prove actual damages because its complaint seeks equitable relief, including unjust enrichment and "other remedies" for Defendants' false advertising. Plaintiff has presented no evidence, however, that Defendants were actually unjustly enriched by their advertising. Plaintiff contends that because the parties agreed to bifurcate discovery on damages, Plaintiff is not required to prove actual damages at this stage. But bifurcation of damages discovery would only excuse Plaintiff's failure to present evidence of its damages *amount*; actual or likely damages is an element of Plaintiff's statutory claims and is thus an issue of liability for which Plaintiff must present evidence at this stage.